**Amanda STEPHENS, by next friend Nelson I. STEPHENS and Kathleen Stephens, Her Legal Guardians, Plaintiffs–Appellants,**

v.

**MAXIMA CORPORATION, Defendant–Appellee.**

Supreme Court of Tennessee, at Knoxville.

Aug. 7, 1989.

---

Robert W. Knolton and Christopher H. Hayes, Knoxville, for defendant-appellee.

George H. Buxton, Buxton, Layton, Webster and Wilkinson, Oak Ridge, for plaintiffs-appellants.

## OPINION

FONES, Justice.

This is an appeal from the trial court's denial of Workers' Compensation benefits to the minor child of the deceased, Kathy Stephens. The trial court determined that the death of Ms. Stephens did not occur in the course of her employment with defendant, Maxima Corporation. We agree.

The deceased, Kathy Stephens, was killed in a fatal automobile accident on 7 May 1987 at approximately 4:00 a.m., one mile from her place of employment, Maxima Corporation. The deceased was employed as a computer operator for the defendant-employer and worked the third shift, which began at 10:00 p.m. and officially ended the following morning at 6:30 a.m.

The sole issue on appeal is whether the trial court erred in its determination that the fatal automobile accident of said employee did not occur in the course of her employment. The underlying facts of this case are basically undisputed. It was stipulated that at all times material, Kathy Stephens, was a full-time employee with the defendant, and Maxima Corporation had distributed a questionnaire to all of its employees entitled "Position Description Questionnaire" (hereinafter P.D.Q.) The P.D.Q. was a survey form prepared by the company's human resources group at corporate headquarters asking each employee to describe their position with the company. The purpose of the form was to establish a uniform wage policy for the company and to help develop job descriptions throughout the company. The due date of the P.D.Q. form was 28 April 1987.

At the time of the accident, Ms. Stephens had left her place of employment with the intentions of taking her lunch break at her home and for the purpose of retrieving her P.D.Q. form. The fatal accident occurred while en route to her residence.

At trial Dennis Reynolds, who was the decedent's on-shift supervisor, testified that to the best of his memory he had communicated by telephone with his supervisor, Mr. Lyles, regarding the P.D.Q. questionnaire. On direct examination he stated:

Q. What did you tell Kathy Stephens and the other employees about the P.D.Q. form that night [5/6/87]?

A. Okay. I told them that Allen [Lyles] had called, and he—I'm not sure if the words were "as soon as possible"—but he wanted those questionnaires to be turned in.

Q. Do you recall what you told the employees?

A. I can't say specifically what I told them, but I'm sure everyone was aware that they were supposed to be turned in.

. . . . .

A. If I said anything [as to particular time limits], it might have been "as soon as possible."

However, Mr. Reynolds testified that he did recall stating at his deposition taken at an earlier date: "I know he [Lyles] called and said for me to tell everyone to get them here as soon as possible." Upon further questioning of exactly what Mr. Lyles had to say, Mr. Reynolds stated: "Well, I think he said as soon as possible, but it's been so long that I can't be for sure."

Ms. Stephens had not turned in her completed P.D.Q. form. Mr. Reynolds testified that later on in the shift Ms. Stephens told him that she was going to go by her home and get hers; "Well, she told me she was going to eat lunch and while she was gone —I'm not sure whether she was going home to eat or what, but she was going to pick up her P.D.Q. and bring it in." Continuing on direct examination:

Q. Did you acquiesce or go along with that statement?

A. Yes.

Q. You didn't voice any objection to it at all?

A. No.

Mr. Reynolds testified that on this particular evening he did not communicate in any form or fashion that the employees had to go home and pick up their forms that night or that they had to be turned in the following day. His testimony was corroborated by the testimony of two co-employees, Mr. McNutt and Ms. King, who testified that the general attitude towards the P.D.Q. form was that nobody really wanted to fill the survey out and neither could remember the due date of the form being emphasized. Both employees could only remember the fact that Mr. Reynolds reminded them to get the forms in and could not recall any mention of time or expeditiousness or any sanction for not returning the form. Ms. King testified that on the evening prior to Ms. Stephens' death Mr. Reynolds had told them to get the forms in "whenever you can get the time."

Ms. King and the deceased both left for lunch to go to their separate homes and retrieve their forms and planned to work on them if time permitted at work. Ms. King stated that she had made the decision, herself, on that night to go home during her lunch break to get her form; no such instruction had been given by Maxima.

There was no specific time set aside for the employees to take their lunch; however, approval to take the lunch break had to be obtained from the shift supervisor. Employees were allowed to either bring their lunch, go out and eat, or get lunch and bring it back to work. Mr. Lyles testified that "it was their [employees] 30 minutes and they could take whatever action they wanted to; just so they took 30 minutes and returned at the completion of the 30 minutes."

The evidence in the trial court revealed that the third shift was eight and one-half hours with a 30–minute "lunch" break. Mr. Lyles, the program manager for M.C. P.S. computer operations and immediate supervisor for all of Maxima's computer operators, testified that it was the company's policy to allow the employees to leave before the precise time that their shift ended. There was a 30–minute lap-over for each shift in order to advise the oncoming shift of exactly where they were, the process that needed to be done, and any problem that might need to be passed on. At the completion of the turnover the outgoing shift could leave if the lead operator was satisfied that they had received good shift turnover. At the particular time in question the workload was very light, so the turnover only took five or ten minutes. The employees were paid for the entire shift, to 6:30 a.m. in the instant case, whether or not they left at 6:10 or at 6:30 a.m.

Mr. Lyles testified that around 10:15 or 10:30 on the night of the 5th he called Mr. Reynolds and advised him that "the forms needed to be turned in and requested he pass onto the operators to turn their P.D.Q. forms as soon as possible."

The standard of review in this case of the findings of fact by the trial judge is *de novo* upon the record of the trial court, accompanied by a presumption of the finding, unless the preponderance of the evidence is otherwise. T.C.A. § 50–6–225(e).

Our workers' compensation law requires that an injury in order to be compensable must be one "arising out of and in the course of employment." Tenn.Code Ann. § 50–6–102(a)(4). "Arising out of" refers to the origin of the injury, while "in the course of" refers to the time, place, and circumstances of the injury. *Knox v. Batson*, 217 Tenn. 620, 399 S.W.2d 765, 770 (1966). The trial court in this case found that the death of the employee did not occur in the course of her employment.

Larson's Workmen's Compensation Treatise recognizes that:

[w]hen the employee has a definite place and time of work, and the time of work does not include the lunch hour, the trip away from and back to the premises for the purpose of getting lunch is indistinguishable in principle from the trip at beginning and end of the work day, and should be governed by the same rules and exceptions.

1 Larson, Workmen's Compensation Law § 15.51 (1985).

The general rule is that injuries received during lunch or dinner break and while

employee is off the employer's premises are not compensable. *See Hudson v. Thurston Motor Lines, Inc.,* 583 S.W.2d 597 (Tenn.1979). However, various exceptions are made to the general rule. The exception to the going and coming rule upon which the appellants rely is termed the "special errand rule." The appellants argue that the actions of the decedent should be viewed as within the course of her employment because she was at her work and left to perform a "special errand" during a break at the specific request of her supervisor in order to obtain the P.D.Q. form. Upon review of the record the evidence preponderates against such findings.

Professor Larson defines the special errand exception as:

When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.

1 Larson, Workmen's Compensation Law § 16.11 (1985).

Upon review of the cases in which other jurisdictions have applied the special errand rule there is a common thread that the employee is usually injured while performing some special act, assignment or mission at the direction of the employer. *See* 1 Larson, Workmen's Compensation Law § 16.11, n. 9 (1985).

The appellants cite *Mason v. N.Y. Abstract Co.,* 11 A.D.2d 569, 200 N.Y.S.2d 677 (N.Y.App.Div.1960) for the proposition that when an employee is asked to perform an errand "as soon as possible" and sets out to accomplish the errand on his way to work he is acting in the course of the employer's business. In *Mason,* the claimant, a lawyer employed by a New York City title company, was *instructed* by his superior "that he was working on a 'rush' title and that claimant should go 'early' next morning to the Surrogate's court; to

get there 'as soon as possible' and telephone his superior." The claimant, who usually commuted to his place of employment by train, decided he could get to the court sooner if he drove his own automobile. While en route, he was injured in an automobile accident. In holding that the claimant was on a special errand of the employer the court stated the proof established that "claimant's work required him to travel to numerous places outside the employer's office," and that claimant would be reimbursed for the expenses of the use of his automobile on this occasion.

The deceased had just left her place of employment with the announced intention of picking up the P.D.Q. form from her residence while on her lunch break. Upon review of the record the evidence does not establish that her employer had instructed, directed, required or even suggested that the employees return home to get the P.D.Q. forms. Such action was the decision of the deceased. Certainly, there was no express or implied requirement or order that the employees return home to get their form. The evidence revealed that Mr. Lyles communicated to the deceased's on-shift supervisor, Mr. Reynolds, to tell the employees to get their forms in as soon as possible. However, the evidence as to exactly how the message was related to the employees is somewhat unclear. Two co-employees of the deceased each testified at trial that Mr. Reynolds placed no urgency, significance or emphasis upon the completion and return of the forms by the end of the shift or even the next shift for that matter. The trial court was of the opinion "had the employer specifically instructed the deceased to retrieve the document on this occasion, this decision would be in favor of the plaintiff."

Accordingly, the trial court's denial of benefits is affirmed. Costs are adjudged against plaintiffs.

DROWOTA, C.J., and HARBISON, COOPER and O'BRIEN, JJ., concur.