# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### February 1, 2006 Session at Nashville

## SHERRY A. HUBBLE ET AL. v. DYER NURSING HOME

**Direct Appeal from the Chancery Court for Gibson County**
**No. 15613     Hon. George R. Ellis, Chancellor**

---

**No. W2005-00503-SC-R3-CV - Filed on April 12, 2006**

---

This workers' compensation action arose out of an automobile accident occurring while the plaintiff was on her way to an orientation session held at a location separate from the nursing home facility at which she had been hired to work. The chancery court awarded the plaintiff 95% permanent partial disability and also ordered the defendant employer to reimburse State Farm, the insurer of the driver of the automobile, for medical payments made under the driver's policy. The court did not order reimbursement for amounts paid by State Farm under the liability portion of the policy. On appeal, the defendant argues: 1) the plaintiff was not an employee at the time of the accident; 2) if she was an employee, the injury did not arise out of and in the course of the plaintiff's employment; 3) the trial court erred in ordering the defendant to reimburse State Farm for medical payments made; and 4) the trial court erred in not allowing the defendant a credit for those amounts already paid by State Farm. The plaintiff appeals the finding of 95% permanent partial disability, arguing that the evidence supports a finding of permanent total disability. State Farm appeals the court's denial of reimbursement for the amount State Farm paid under the liability provision of the policy. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel. Upon due consideration, we affirm the decision of the chancery court that the plaintiff was an employee, that she was injured in the course and scope of her employment, and that she suffered 95% permanent partial disability. We also hold that the trial court correctly ordered the defendant to reimburse State Farm for the medical benefits paid while denying reimbursement for the amounts paid under the liability provision. Finally, we conclude that the defendant is not entitled to a credit for the amount paid by State Farm.

**Tenn. Code Ann. § 50-6-225(e); Judgment of the Trial Court is Affirmed**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, Jr., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

John D. Burleson and Michael L. Mansfield, Jackson, Tennessee, for the appellant, Dyer Nursing Home.

Michael A. Carter and C. Timothy Crocker, Milan, Tennessee, for the appellee, Sherry A. Hubble.

John S. Little, Jackson, Tennessee, for the appellee, State Farm Insurance Company.

## OPINION

## FACTUAL BACKGROUND

While a junior in high school, the plaintiff, Sherry Hubble, became interested in working at Dyer Nursing Home where her mother was employed. The plaintiff was seventeen years old. On December 15, 2000, the plaintiff went to the nursing home and completed an application to work at that facility as a "hostess."[1] As part of the hiring process, the plaintiff was required to take a tuberculosis skin test, which she did on that day. She returned on December 18, at which time she was told that her tuberculosis test was negative.

While at the nursing home on December 18, the plaintiff met with Betty Caton, the Director of Nursing. During this meeting, Ms. Caton gave the plaintiff an "employee package" which contained numerous documents including a policy and procedures manual, OSHA guidelines, safety memos, a statement of residents' rights, and a lunch card for the plaintiff to use at the facility. The plaintiff also filled out and signed employment documents necessary for tax and payroll purposes. The plaintiff and Ms. Caton agreed that the plaintiff would earn $5.15 per hour. The nursing home then sent the plaintiff to a nearby facility for a physical examination, which she passed.

Ms. Caton told the plaintiff that she was required to attend three days of orientation before starting work at the nursing home. The orientation was at a separate facility located in Bells, Tennessee, approximately thirty miles from Dyer, Tennessee. This facility was a separate nursing home, not affiliated with Dyer Nursing Home. The plaintiff was told to report to work at Dyer Nursing Home at six o'clock in the morning on the day following her orientation training. The plaintiff testified that she had been under the impression that she would get paid for half the time she spent at the orientation. She said that when she left the nursing home on December 18, she understood that she had been hired and was an employee of the nursing home because "Betty [Caton] told me after I got through with my training that I was to report back at the nursing home the following day after that morning at 6 o'clock and they was [sic] going to show me how to clock in and show me around the nursing home."

Both Betty Caton and Jerry Park, the administrator of Dyer Nursing Home, testified that the plaintiff's employment was conditioned on her attending the three-day orientation session. In other words, it was their position that the plaintiff would not become an employee of the nursing home until the orientation was complete and she arrived at the nursing home the following day and

---

[1] This job involved activities such as making beds, passing out snacks and ice to the residents, and some light cleaning of rooms.

-2-

"clocked in." Thus, according to the nursing home, the plaintiff was never more than a "prospective" employee. Betty Caton did testify that all employees get paid for the full time spent in orientation and that this pay is reflected on their first paycheck from the nursing home.

The plaintiff was to attend orientation at the training center in Bells, Tennessee on December 19, 20, and 21 for eight hours each day. She rode to the facility with Scarlet Caton, who was traveling to the Bells facility for additional training. Also in the car was another newly-hired employee, Casey Sheffield.[2] At the orientation, the plaintiff was required to sign in and out so that the nursing home could be notified as to who attended the training and could keep a record for payroll purposes.

While driving to the facility on the third day, December 21, 2000, the women were involved in an automobile accident. As a result of the accident, the plaintiff sustained significant injuries to her back, right leg, ankle, and foot. These injuries required the fusion of her spine at the L1 level and the fusion of her right ankle. The plaintiff was hospitalized for approximately one month, after which she underwent inpatient rehabilitation for four more months. By the time of trial, the plaintiff had undergone approximately twenty-eight surgeries.

The plaintiff was treated by orthopedic surgeon Dr. George Wood. Dr. Wood released the plaintiff at maximum medical improvement on June 5, 2003, and assigned her a 40% permanent anatomical impairment to her body as a whole. Dr. Wood opined that the plaintiff could work in the future, although she was limited to performing sedentary work which would allow her flexibility to move around throughout the day.

The plaintiff was evaluated by Dr. Joseph Boals, an orthopedic surgeon, for the purposes of obtaining an anatomical impairment rating in connection with this case. Dr. Boals opined that the plaintiff had a 61% permanent anatomical impairment rating to her body as a whole. He did not disagree with the restrictions placed on the plaintiff's activities by Dr. Wood, nor did he disagree with Dr. Wood's opinion regarding her ability to engage in sedentary work.

At the defendant's request, the plaintiff was evaluated by Patsy Bramlett, a certified rehabilitation counselor and licensed professional counselor, for purposes of determining the extent of the plaintiff's vocational disability. Ms. Bramlett found that the plaintiff was functioning at below a high school equivalency level. She testified that the results of the testing indicated that the plaintiff would retain up to a 95% vocational disability as the result of her injuries. However, after her vocational disability evaluation was completed, the plaintiff did succeed in completing her high school education. Ms. Bramlett testified that as a high school graduate, and depending on her actual activity level, the plaintiff's vocational disability was likely in the neighborhood of 77%.

---

[2] This case was consolidated at trial with the case of <u>Sheffield v. Dyer Nursing Home</u>, Gibson County Chancery Court No. 15730. The liability portion of Ms. Sheffield's case was tried at the same time as the first phase of this case. At the time of the second phase for these cases, Ms. Sheffield initially requested a continuance and then later voluntarily dismissed her case against Dyer Nursing Home.

At trial, the plaintiff testified that her ability to drive is limited; she has difficulty lifting minimal amounts of weight; she has difficulty sitting or standing in one position for any length of time; and she cannot do many of the basic household chores. However, she testified that she babysits her brother's two children, who were four years old and nine months old at the time of trial.

At the time of the accident, Scarlet Caton, the driver of the automobile in which the plaintiff was a passenger, was insured under a policy of insurance with State Farm Insurance Company ("State Farm"). This policy contained a $100,000 limit per person for liability and a $100,000 limit for medical payments coverage for anyone injured while operating or occupying a vehicle insured under the policy. State Farm settled with the plaintiff, paying her $100,000 for medical expenses and $100,000 under the liability coverage.

The plaintiff filed a complaint against Dyer Nursing Home, seeking workers' compensation benefits. State Farm sought to intervene as a plaintiff in the case, alleging that if Dyer Nursing Home were found liable to the plaintiff for workers' compensation benefits, State Farm was entitled to reimbursement of its subrogation interest in the amount of $200,000 previously paid to the plaintiff under the terms of Scarlet Caton's insurance policy.

The trial court bifurcated the trial. The first phase was to determine whether the plaintiff was an employee of Dyer Nursing Home at the time the accident occurred and whether the plaintiff's injuries from the accident arose out of and in the course and scope of the plaintiff's employment. The second phase was to determine the extent of the plaintiff's vocational disability if the defendant was found liable during the first phase of the trial. Following the hearing in the first phase, the trial court found that the plaintiff was an employee of the defendant at the time of the accident and that her injuries arose out of and in the course and scope of her employment with defendant on that date.

At the conclusion of the second phase of the trial, the trial court awarded the plaintiff permanent partial disability benefits in the amount of 95% to her body as a whole, plus past and future medical expenses. The parties stipulated that the plaintiff's past medical expenses related to the accident totaled $587,331.50. In addition, the court ordered the defendant to reimburse State Farm for $100,000 in medical payments which it had made under its insurance policy.[3]

Dyer Nursing Home appealed. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel.

## STANDARD OF REVIEW

Our standard of review of factual issues in a workers' compensation case is de novo upon the record of the trial court, accompanied by a presumption of correctness of the trial court's factual

---

[3] State Farm had paid $66,666.66 directly to the Regional Medical Center, one of the plaintiff's health care providers. The remaining $33,333.34 was paid to the plaintiff's attorney. The trial court held that the $33,333,34 paid to the plaintiff's attorney would be deducted from the attorneys' fees collected from of the workers' compensation award.

findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (2005); see also Rhodes v. Capital City Ins. Co., 154 S.W.3d 43, 46 (Tenn. 2004); Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 825-26 (Tenn. 2003). "The trial court's findings with respect to credibility and weight of the evidence may generally be inferred from the manner in which the court resolves conflicts in the testimony and decides the case." Rhodes, 154 S.W.3d at 46 (citing Tobitt v. Bridgestone/Firestone, Inc., 59 S.W.3d 57, 61 (Tenn. 2001)). Our standard of review of questions of law is de novo without a presumption of correctness. Id.

## ANALYSIS

### A. Was the plaintiff an employee?

Tennessee's Workers' Compensation Law defines an "employee" as "every person, including a minor, . . . in the service of an employer, . . . under any contract of hire or apprenticeship, written or implied." Tenn. Code Ann. § 50-6-102(10)(A) (2005). We have previously held that "[i]n order for one to be an employee of another for purposes of our Worker's Compensation Law, it is . . . required that there be an express or implied agreement for the alleged employer to remunerate the alleged employee for his services in behalf of the former." Black v. Dance, 643 S.W.2d 654, 657 (Tenn. 1982); see also Garner v. Reed, 856 S.W.2d 698, 701 (Tenn. 1993) ("the word 'hire' denotes payment of some kind").

The defendant argues that the plaintiff was not an employee at the time of the accident because there was no "contract of hire" in place. According to the defendant, there was no "contemplated mutual assent and meeting of the minds" required to form an enforceable contract in Tennessee. See Davidson v. Holtzman, 47 S.W.3d 445, 453 (Tenn. Ct. App. 2000) (an oral agreement is enforceable if there is a "mutual assent to the contract's terms and . . . the terms are sufficiently definite to be enforceable."). The defendant emphasizes the fact that both Jerry Park and Betty Caton testified that a person applying for the "hostess" position was not allowed to work at the nursing home until that person successfully completed a three-day orientation and therefore could not be an employee until he or she actually came to work at the nursing home.

The defendant relies upon Beach v. Schwan's Sales Enter., Inc., No. M1999-00416-WC-R3-CV, 2000 WL 758341 (Tenn. Workers' Comp. Panel, June 13, 2000), to support its contention that the plaintiff was not an employee of the defendants at the time of the accident. In Beach, the plaintiff interviewed with the employer, at the end of which the plaintiff was told that "the position would be offered to him if he successfully completed 'ride day,' the next step in the application process." Id. at *1. During ride day, the plaintiff accompanied another salesperson on that salesperson's route to observe the interaction between the salesperson and his customers. The plaintiff slipped while stepping out of the truck and was seriously injured. The Workers' Compensation Panel noted that to come under the definition of employee, the plaintiff "must prove that, at the time of the injury, there was an expressed or implied agreement that the worker was to be compensated for his services by the alleged employer." Id. (citing Black v. Dance, 643 S.W.2d 654 (Tenn. 1982)). The Panel found that "[a]lthough it appears from the record that the salesperson whom the claimant was

accompanying paid for his lunch on the date of the injury, we find in the record no evidence that he was or expected to be compensated by the employer." Id. As a result, the Panel affirmed the lower court's denial of workers' compensation benefits.

The facts of Beach are readily distinguishable from the facts in the case before us. Unlike the plaintiff in Beach, the plaintiff in this case was being paid for her time at orientation. While there is a factual dispute as to whether the plaintiff and Ms. Sheffield were to be paid hour for hour, as the representatives of the defendant testified, or to be paid for half the time spent in training, as the plaintiff and Ms. Sheffield understood, there is no dispute that they were to receive some level of compensation. There was also no dispute that as soon as the orientation was over, the plaintiff was to report to the nursing home to begin her work as a hostess at that facility.

The facts of this case are more akin to those in Williams v. Walden Sec., No. M2000-01273-WC-R3-CV, 2001 WL 363070 (Tenn. Workers' Comp. Panel, April 12, 2001), in which the Workers' Compensation Panel found that the plaintiff was indeed an employee while undergoing a brief orientation. In Williams, the plaintiff applied for a security position at Nashville Electric Service. He was told that he needed the approval of the representative of N.E.S. prior to commencing work. He received this approval and was instructed to meet with the guard whom he would be replacing to receive training. This orientation process required approximately two hours to complete, for which the plaintiff was not to be paid. During this training, the plaintiff was taken on a walking tour of the facility, at which time he fell, suffering severe injury to his eye. In response to the defendant's argument that the plaintiff was not an employee at the time of the accident, the Panel held that "[w]e find in the record nothing which would exclude the claimant and it is clear from the record that the claimant was under a contract of hire at the time of his injury, whether he was paid for his time or not." Id. at *2.

The evidence in the present case makes it clear that the plaintiff was offered a job at the nursing home and that she accepted that job. While she was required to attend three days of orientation before starting in her position as hostess, she was to be paid for this orientation. The orientation was not part of the application process in the way that a test or physical would be part of the application process. See, e.g., Blankenship v. Am. Ordnance Sys., LLS, 164 S.W.3d 350 (Tenn. 2005) (back injury suffered while performing a stress test in course of application process was not compensable because plaintiff was not an employee). We hold that the evidence does not preponderate against the trial court's finding that the plaintiff was an employee of the defendant nursing home at the time of the accident.

### B. Was the plaintiff injured in the course and scope of employment?

To be compensable under the workers' compensation law, an injury must "aris[e] out of and in the course of employment." Tenn. Code Ann. § 50-6-102(13) (2005). "In Tennessee, as in most jurisdictions, the statutory requirements that the injury arise out of and occur in the course of the employment are not synonymous, although both elements exist to ensure a work connection to the injury for which the employee seeks benefits." Blankenship, 164 S.W.3d at 354 (citing Sandlin v.

Gentry, 300 S.W.2d 897, 901 (Tenn. 1957)).

The phrase "arising out of" refers to cause or origin and "in the course of" refers to time, place and circumstances. Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 487 (Tenn. 1997). An injury arises out of the employment when "there is a causal connection between the conditions under which the work is required to be performed and the resulting injury." Blankenship, 164 S.W.3d at 354 (citing Fritts v. Safety Nat'l Cas. Corp., 163 S.W.3d 673, 678 (Tenn. 2005)). An injury occurs in the course of employment if "it takes place within the period of the employment, at a place where the employee reasonably may be, and while the employee is fulfilling work duties or engaged in doing something incidental thereto." Blankenship, 164 S.W.3d at 354 (citation omitted).

As a general rule, an employee is not acting within the course of employment when the employee is going to or coming from work unless the injury occurs on the employer's premises. See Howard v. Cornerstone Med. Assoc., 54 S.W.3d 238, 240 (Tenn. 2001); Lollar v. Wal-Mart Stores, Inc., 767 S.W.2d 143, 150 (Tenn. 1989). For example, the employer's parking lot is considered part of the employer's premises, see Lollar, 767 S.W.2d at 150, but "[once] the employee has exited the parking area and begins traveling on personal time, away from the employer's premises, he is no longer in the course of employment." McCurry v. Container Corp. of America, 982 S.W.2d 841, 845 (Tenn. 1998).

There are, however, several exceptions which bring an employee's travel to and from work within the course and scope of his employment. Phillips v. A&H Constr. Co., 134 S.W.3d 145, 152 (Tenn. 2004). One such exception is the "special errand exception." Id.; see also Stephens v. Maxima Corp., 774 S.W.2d 931 (Tenn. 1989). Under this exception, an employee may be compensated for an off-premises injury "while performing some special act, assignment or mission at the direction of the employer." Stephens, 774 S.W.2d at 934.

> When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself. Upon review of the cases in which other jurisdictions have applied the special errand rule there is a common thread that the employee is usually injured while performing some special act, assignment or mission at the direction of the employer.

Id. (citations omitted).

In Stephens, the employee was involved in a fatal automobile accident one mile from her place of employment when, during her lunch break, she had gone home to retrieve an employment record which had to be turned in to her employer. In denying compensation and holding that the "special errand or mission" exception did not apply, this Court stated the evidence was not sufficient

to show the employer had instructed, directed or even suggested that the employee return home to get the employment record and that such action on her part had been her decision. Id.

However, this "special errand" exception was found to apply in two cases decided by the Workers' Compensation Panel which have facts similar to those in the case at hand. First, in Carter v. Utica Mutual Ins. Co., No. E2002-01779-SC-WCM-CV, 2003 WL 22080788 (Tenn. Workers' Comp. Panel, Aug. 27, 2003), the employee, who worked in Chattanooga, Tennessee, was injured while traveling home from Atlanta where she was to have attended a seminar for her employer. The Panel held that the "special errand" exception applied because:

> The employee's general work duties did not require any travel activities. On the day in question, she was required by her employer to attend the seminar in Atlanta thereby exposing her to risks she would not normally encounter in going to and coming from her work in Chattanooga. She was to be paid regular wages for attending the seminar and was to be reimbursed for mileage expenses. While attending, she would have been engaged in activities beneficial to her employer.

Id. at *3. Likewise, in Carter v. Phoenix Restaurant Group, No. 03S01-9602-CH-00013, 1997 WL 26296 (Tenn. Workers' Comp. Panel, Jan. 23, 1997), the claimant, an assistant manger trainee at a Wendy's in Johnson City, was instructed to go to the employer's Kingsport, Tennessee location for mandatory testing. The employee did and was injured in a traffic accident in route to her home from Kingsport following the test. She was paid for the time required to take the test, but was not reimbursed for mileage. The court held that the "special errand" exception applied. Id. at *3.

In this case, the plaintiff was hired to work at Dyer Nursing Home, located in Dyer, Tennessee. Thus normal travel from her home to and from Dyer Nursing Home would not be considered to be in the course and scope of her employment under the "going to and coming from work" rule. See Stephens, 774 S.W.2d at 934. However, the accident occurred while the plaintiff was on her way to an orientation session that was being held in Bells, Tennessee, approximately thirty miles away from the nursing home in Dyer. This trip falls with in the "special errand or mission" exception because it was a special assignment at the direction of the employer, and "the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself." Stephens, 774 S.W.2d at 934.

### C. Did the trial court err in finding 95% vocational disability?

The trial court awarded the plaintiff 95% permanent partial disability. However, the plaintiff argues that the evidence preponderates in favor of a finding of total disability. Any award of permanent total disability must be in compliance with the statutory definition of total disability contained in Tennessee Code Annotated section 50-6-207(4) (2005). The test as to whether an employee is permanently and totally disabled requires us to determine if the employee is "totally incapacitate[d] . . . from working at an occupation that brings the employee an income . . . ." Tenn.

Code Ann. § 50-6-207(4)(B) (2005); see also Cleek v. Wal-Mart Stores, Inc., 19 S.W.3d 770, 774 (Tenn. 2000).

The determination of permanent total disability is to be based on a variety of factors such that a complete picture of an individual's ability to return to gainful employment is presented to the Court. Vinson v. United Parcel Service, 92 S.W.3d 380, 386 (Tenn. 2002); Cleek, 19 S.W.3d at 774. Such factors include the employee's skills, training, education, age, job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability. Cleek, 19 S.W.3d at 774 (citing Roberson v. Loretto Casket Co., 722 S.W.2d 380, 384 (Tenn. 1986)). Though this assessment is most often made and presented at trial by a vocational expert, "it is well settled that despite the existence or absence of expert testimony, an employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is 'competent testimony that should be considered.'" Vinson, 92 S.W.3d at 386 (quoting Cleek, 19 S.W.3d at 774).

In support of her argument that the trial court should have found permanent total disability, the plaintiff highlights the fact that both Dr. Wood and Dr. Boals assigned relatively high anatomical impairment ratings to the body as a whole: 40% and 61% respectively. Additionally, she testified at trial that prior to the accident she was in good health, but that following the accident, she has limited driving ability, difficulty lifting small amounts of weight, and trouble sitting or standing for long periods of time. She said that her husband must do the household chores because she is unable to do them.

The nursing home responds that the trial court's award of 95% should be affirmed in light of the vocational testimony. Dr. Wood opined that the plaintiff should be able to work in the future at a sedentary job that allowed her the flexibility to move around during the day. Dr. Boals did not disagree. Ms. Bramlett, the rehabilitation counselor, testified that the plaintiff was between 77% and 95% vocationally disabled. Finally, the plaintiff testified that she did graduate from high school after the accident and is at least capable of babysitting her brother's two children.

Considering all the evidence presented at trial, both by the experts and by the plaintiff herself, we hold that the evidence does not preponderate against the trial court's finding of 95% permanent partial disability.

### D. Subrogation

#### 1. Payments made under the medical payment coverage provision

The trial court ordered Dyer Nursing Home to reimburse State Farm for payments totaling $100,000 made by State Farm to the plaintiff's medical providers under the medical payment coverage provision of the policy. The policy in question provides for medical payments coverage for bodily injuries sustained by any person occupying a vehicle covered under the liability section of the policy. Thus, by virtue of being a passenger in the vehicle operated by Scarlet Caton, the

plaintiff qualified for medical payments coverage up to the amount of $100,000. However, the policy specifically provides that medical payment coverage benefits are not payable "to the extent workers' compensation benefits are required to be payable."

State Farm argues that it is entitled to reimbursement for the $100,000 paid to the plaintiff under the medical payment coverage because the workers' compensation law requires that the employer pay for the cost of all reasonable and necessary medical care. See Tenn. Code Ann. § 50-6-204(a)(1) (2005). The defendant responds that not only did the trial court err in requiring the defendant to reimburse State Farm for the $100,000 in medical payments made, but that the court should give the defendant a credit for the full amount of all sums paid to the plaintiff or her healthcare providers by State Farm. The defendant relies upon Tennessee Code Annotated section 50-6-112, which gives an employer who has paid workers' compensation benefits to an employee a right of subrogation against any recovery that the employee obtains from a third-party for the same injury.

"Tennessee Code Annotated section 50-6-204(a)(1), part of the workers' compensation statutory scheme, makes it crystal clear that the employer is obligated to the employee to pay reasonable and necessary medical expenses for work-related injuries." Moore v. Town of Collierville, 124 S.W.3d 93, 99 (Tenn. 2004). Where an employer is liable for such medical expenses, the employer must pay the medical providers directly for the costs of such care, rather than the employee personally. See Staggs v. Nat'l Health Corp., 924 S.W.2d 79, 81 (Tenn. 1996) (citing W. Am. Ins. Co. v. Montgomery, 861 S.W.2d 230, 231 (Tenn. 1993)). However, where the employee has personally paid for the disputed medical treatment, the employer must reimburse the employee personally. Id.; see also State Auto. Mut. Ins. Co. v. Hurley, 31 S.W.3d 562, 565 (Tenn. Workers Comp. Panel 2000). Similarly, where the employee's health insurance carrier has paid for disputed medical expenses, the employer is required to reimburse the health insurance carrier. See Moore, 124 S.W.3d at 99.

As we noted in Moore,

> The legislature has decided that it is the employer's statutory responsibility to pay reasonable and necessary medical expenses for work-related injuries and that workers' compensation provisions should be construed to achieve their remedial purpose. . . .
>
> [O]nce a finding has been made that the employee's injury is work-related, the health insurer can seek reimbursement from the employer for expenses paid on the employee's behalf because health insurance contracts do not cover work-related injuries. Before such a finding is made, however, employees may have difficulty recovering expenses from either the employer or a health insurer and could ultimately be forced to either pay for their own medical expenses or delay treatment altogether. Clearly, this is not a result envisioned under the workers' compensation statutes.

Id. at 99 (internal citations and footnote omitted).

In this case, instead of a health insurer paying for the medical expenses, the liability insurer for the driver of the automobile paid $100,000 in medical expenses. When this was paid, the employer was denying that the injury was covered by workers' compensation, thus forcing the plaintiff to seek financial compensation elsewhere. However, as we have determined, the injury was in fact covered under the workers' compensation statute, and therefore, the employer is liable for all necessary and reasonable medical expenses. See Tenn. Code Ann. § 50-6-204(a)(1). The State Farm policy specifically states that medical benefits are not payable under the policy if the medical expenses are covered by workers' compensation. As such, the parties in this case are in a situation almost identical to that in Moore, in that a third-party insurer paid for medical expenses which it was not obligated to pay because those expenses were covered by workers' compensation and were required to be paid by the employer.

We therefore hold that State Farm is entitled to reimbursement for the medical payments made to the plaintiff's medical providers.

*2. Payments made under the liability coverage provision*

State Farm claims that it is entitled to "equitable subrogation" with respect to the $100,000 that it paid to the plaintiff under the liability provision of the policy. The nursing home responds that the driver of the automobile was immune from liability as a co-employee, and therefore, equitable subrogation should not apply as State Farm was not obligated to pay anything to the plaintiff. The nursing home again argues that it should receive a credit under Tennessee Code Annotated section 50-6-112 for the amount paid to the plaintiff by State Farm so the plaintiff does not receive double recovery.

"'Subrogation is a right which is founded upon equity and justice and accrues when one person for the protection of his own interests, pays a debt for which another is primarily liable.'" Wimberly v. Am. Cas. Co. of Reading, Pa. (CNA), 584 S.W.2d 200, 203 (Tenn. 1979) (quoting Amos v. Central Coal Co., 277 S.W.2d 457, 462 (Tenn. Ct. App. 1954)). With respect to insurance, "subrogation allows the insurer to 'stand in the shoes' of the insured and assert the rights of the insured against a third party." York v. Sevier County Ambulance Auth., 8 S.W.3d 616, 618-19 (Tenn. 1999) (citing Wimberly v. Am. Cas. Co., 584 S.W.2d 200, 203 (Tenn. 1979)).

However, in the absence of legal compulsion to pay the debt of another, voluntary payment of another's debt, absent fraud, accident, mistake, or by contract with the payee, does not entitle one to subrogation. Walker v. Walker, 200 S.W. 825 (Tenn. 1918).

A mere volunteer, intermeddler, or stranger, or one acting officiously in paying the debt of another, is not entitled to subrogation . . . where he pays without an assignment of the debt or an agreement for subrogation. A "volunteer" or "stranger" within this rule is one who has no obligation or liability to pay the debt and has no

-11-

interest in the property affected by the debt. Some compulsion to pay, such as legal process, is ordinarily essential and sufficient to support subrogation.

Goodfriend v. United Am. Bank, 637 S.W.2d 870, 870 (Tenn. Ct. App. 1982) (quoting 83 C.J.S., Subrogation, § 9).

State Farm was under no obligation to pay the plaintiff under the liability provision of the policy held by Scarlet Caton because Scarlet Caton was immune from suit as a co-employee of the plaintiff. See Taylor v. Linville, 656 S.W.2d 368, 370 (Tenn. 1983) (holding that an employee can not hold a fellow employee liable where, at the time of the accident, both parties were acting within the scope and course of their employment). State Farm chose to settle a claim of questionable validity in an effort to protect its insured from liability above the policy limits. State Farm was in no way compelled to pay its policy limits by any judicial decision or any other legally enforceable means. Nor was it bound by any contractual duty with the plaintiff to pay her the money under the policy. State Farm does not allege any act of fraud, mistake or accident which induced its payment to the plaintiff. Therefore, State Farm's payment to the plaintiff was voluntary and does not entitle State Farm to subrogation.

### 3. Credit to defendant under Tennessee Code Annotated section 50-6-112

The nursing home not only argues that State Farm should not receive reimbursement for benefits paid, but that the nursing home should receive credit for that amount paid by State Farm. The nursing home relies upon Tennessee Code Annotated section 50-6-112(a), which provides:

(a) When the injury or death for which compensation is payable under the Workers' Compensation Law . . . was caused under circumstances creating a legal liability against some person other than the employer to pay damages, the injured worker . . . shall have the right to take compensation under such law . . . .

(2) In the event the net recovery by the worker . . . exceeds the amount paid by the employer, and the employer has not, at the time, paid and discharged the employer's full maximum liability for workers' compensation under this chapter, the employer shall be entitled to a credit on the employer's future liability, as it accrues, to the extent the net recovery collected exceeds the amount paid by the employer.

In essence, under Tennessee's Workers' Compensation Law, an injured employee may recover from a third-party tortfeasor whose negligence resulted in injury, and the employer who has paid or becomes obligated to pay compensation has a right of subrogation against such third-party tortfeasor. See Curtis v. G.E. Capital Modular Space, 155 S.W.3d 877, 883 (Tenn. 2005).

However, this right of subrogation does not apply to the facts of this case. Section 50-6-112 applies only where the injury "was caused under circumstances *creating a legal liability against some person other than the employer* to pay damages." Tenn. Code Ann. § 50-6-112(a) (emphasis

-12-

added.) "In interpreting § 50-6-112(a), this Court has held that a co-employee who, while acting within the course of his employment, causes an injury through his negligence is not 'some person other than the employer.'" Taylor, 656 S.W.2d at 370 (quoting Majors v. Moneymaker, 270 S.W.2d 328, 331 (Tenn. 1954)). Thus, an employee can not hold a fellow employee liable where, at the time of the accident, both parties were subject to the workers' compensation laws and both were acting within the scope and course of their employment. Id.

## CONCLUSION

To summarize, we hold that the plaintiff was an employee of the defendant nursing home at the time she was injured in the automobile accident. The accident arose out of and was in the course of her employment because the travel to the training facility falls under the "special errand" exception to the general rule that travel to and from work is not within the course of employment. We also uphold the trial court's finding that the plaintiff was 95% permanently partially disabled. With respect to the subrogation rights of the various parties, we affirm the decision of the trial court ordering the defendant nursing home to reimburse State Farm for the medical payments made and agree that State Farm is not entitled to reimbursement for the payments made under the liability provision. Lastly, the defendant is not entitled to a credit under Tennessee Code Annotated section 50-6-112(a) for amounts paid by State Farm to the defendant.

Costs of this appeal are taxed equally to Dyer Nursing Home and State Farm Insurance Company, and their sureties, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE