**FILED**
**Mar 19, 2026**
**01:21 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | |
|---|---|
| DAN RAYBURN,<br>　　　　Employee,<br>v.<br>CITY OF CAMDEN,<br>　　　　Employer,<br>TN MUNICIPAL LEAGUE RISK<br>MANAGEMENT,<br>　　　　Insurer,<br>and<br>TROY HALEY, Administrator,<br>Subsequent Injury and Vocational<br>Recovery Fund. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No.: 2024-70-5106

State File No.: 24193-2024

Judge Robert V. Durham

---

## COMPENSATION ORDER GRANTING BENEFITS

---

The Court held a Compensation Hearing on February 26, 2026, to determine whether Mr. Rayburn suffered a compensable injury to his left hip, and if so, the extent of his permanent vocational disability. The Court finds that Mr. Rayburn proved he suffered a compensable injury and is entitled to extraordinary benefits under section 50-6-242.

### History of Claim

Mr. Rayburn was 62 when he suffered a fracture to his left hip on October 16, 2023, while pulling a barrel of waste oil up an incline using a two-wheel dolly. He slipped and fell, and the dolly fell on him and pinned him to the pavement. Emergency medical services took Mr. Rayburn to the hospital, where surgeons repaired his hip.

1

However, Mr. Rayburn's hip fracture failed to heal, and in April 2024, he was referred to Dr. Matthew Christie for further evaluation and treatment, which ultimately led to a left hip replacement. Eventually, Dr. Christie placed him at maximum medical improvement on February 3, 2025, and assigned an 11% impairment. He also placed restrictions of no lifting more than 30 pounds, no standing more than four to six hours per day, and no aerobic activities. Dr. Christie later completed a form stating that Mr. Rayburn's injury prevented him from performing his regular job duties with Camden.

Dr. Christie last saw Mr. Rayburn in April 2025 for a one-year post-surgical follow-up. Mr. Rayburn has not sought further treatment since.

In his deposition, Dr. Christie testified that Mr. Rayburn would not injure his hip replacement with activity. But because he uses a cane, he would be incapable of climbing a ladder or lifting heavy weights, or really "doing any sort of manual labor."

However, immediately after this testimony, he was asked to review a functional capacity evaluation stating that Mr. Rayburn could not walk for more than five or ten minutes, had to use rails to navigate stairs, and had difficulty putting on his shoes and socks. The evaluation also said that he could sit in a chair for one hour. Dr. Christie concluded that Mr. Rayburn's function was based on his ability to tolerate activities and that these limitations would be permanent.

On cross-examination, Dr. Christie was again asked about Mr. Rayburn's permanent restrictions. He said that according to his last work release, based on his evaluation and treatment, his restrictions were no lifting over 30 pounds, limit standing/walking to six hours a day, and no aerobic activity.

Dr. Christie was not asked about Mr. Rayburn's current complaints of complete numbness going down his left leg past his knee if he stayed in one position for long or that he experienced uncontrolled incontinence when that happened. He stated that he was not even aware of those complaints.

After Dr. Christie placed him at maximum medical improvement, Mr. Rayburn met with Roger Pafford, mayor of Camden, to discuss work. Mr. Rayburn did not feel he could do his previous job with the Streets Department, and Mr. Pafford did not have any part-time or light-duty work. Although Mr. Pafford testified that he would have liked to return Mr. Rayburn to work, he terminated his employment. Mr. Rayburn has not worked since. His weekly compensation rate is

2

$510.09.

Mr. Rayburn sought permanent total disability benefits or alternatively additional extraordinary benefits under section 50-6-242(a)(2). To that end, he submitted the following evidence.

He is currently 65 years old. He completed the ninth grade before dropping out of high school. He worked for a few years at a factory before getting a job delivering milk, which required him to drive a truck, unload and stock gallons of milk, and do bookkeeping and sales. He did this for ten years before Camden hired him for its Streets Department in the late 1990s.

Mr. Rayburn began as a laborer. His duties included picking up trash, stacking and hauling brush, repairing potholes, and trimming trees. After a few years, he became an operator. He drove and operated city vehicles, including bucket trucks, backhoes, salt trucks, and graders but still performed many of the physical laborer tasks.

Mr. Rayburn testified that over the years, he has had several medical conditions that have limited his physical activities. He had a heart attack 15 years ago. He suffered from a double hernia that was surgically repaired but did not lift as much as before the surgery. He also had a work accident, where a log came through the rear window of his truck and hit his head. The accident caused him to suffer from vertigo, which prevented him from working on ladders or in the bucket truck. However, Mr. Rayburn did not produce any medical records or doctor's opinions documenting these conditions or his asserted limitations.

Mr. Rayburn informed his supervisors of these conditions and limitations, but except for his vertigo preventing him from working at a height, he worked his regular job duties.

As for his current condition, Mr. Rayburn testified that he continues to suffer from significant problems with his left hip and low back. He said that pain travels across his low back and down his left leg. He cannot stand or sit for more than 15 or 20 minutes before he needs to switch positions. He testified that not only does he suffer from pain, but after a few minutes of the same activity, his left leg becomes completely numb from his hip to below the knee. He can only walk very short distances without a cane. He said his numbness leads to uncontrolled urination.

While he drives his own vehicle and periodically travels to Nashville, he must

3

stop frequently. He cannot mow the lawn or work in his shop for more than an hour before needing a break. He gave up hunting and fishing, and he no longer drives his four-wheeler. He said he never gets a full night's sleep due to his pain and urinates five or six times a night.

He has not looked for work because he feels he cannot do manual labor and he has no other skills. He knows very little about computers. Mr. Rayburn testified that before his injury, he had intended on working to his full retirement age of 67, but instead he filed for social security retirement benefits and received his first check in January 2024. He receives $1,454.90 monthly.

Mr. Rayburn's wife also testified as to his limitations. She said that he does not engage in significant physical activity, such as yardwork or working in his shop, without taking frequent breaks. He cannot walk for more than 45 minutes to an hour. She confirmed that he has urinated on himself occasionally and has difficulty sleeping. She said that if he drives to Nashville, he will take a break in the middle of the trip.

Mr. Rayburn also testified about his accident. While the mechanics of Mr. Rayburn's injury were not disputed, Camden contested whether moving the oil was in the course and scope of his employment.

On that issue, Mr. Rayburn explained that the department stored waste oil in a large tank until it could be removed by an outside business. He said he often used this waste oil to lubricate city machinery to protect against rust and aid in moving frozen chains and hinges, and this was common practice for him and other employees. On the date of injury, he was taking the used oil to one of the machines to lubricate it when he fell. Mr. Rayburn admitted his supervisor, Kevin Johnson, did not instruct him to use the oil, but Mr. Rayburn said department employees were often left to perform tasks on their own initiative.

Mr. Rayburn admitted that he had planned to take some oil home with him at some point for a personal project, and he "probably" would have done so on the day of injury after he finished lubricating the machine. He said that employees often took waste oil home for personal use, and no one ever objected.

Camden offered the testimony of several of its employees on this issue. Mr. Rayburn's coworkers testified that they heard him ask for some waste oil on the morning of his accident. They said that they had never removed any waste oil from the tank where it is kept and never used it to lubricate any machinery. One of them

4

said that before they began using the commercial cleaner they use now, he had used a mixture of new oil and diesel on the machinery.

Mr. Johnson testified that he remembered Mr. Rayburn asking for a bucket to put waste oil in, and he told him to ask the mechanic. He said that he has never used waste oil to lubricate the machines, and if anyone asked, he would have advised against it.

## Findings of Fact and Conclusions of Law

Mr. Rayburn has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015).

### *Causation*

To be compensable, Mr. Rayburn's injury must arise primarily out of and within the course and scope of his employment. Tenn. Code Ann.§ 50-6-102(12). Camden agreed that Mr. Rayburn's hip fracture occurred at work, but it argued that it did not primarily arise out of the performance of his duties and happened during a purely personal errand.

Longstanding Tennessee law explains the difference between these two requirements:

> The phrase "arising out of" refers to cause or origin and "in the course of" refers to time, place and circumstances. An injury arises out of the employment when "there is a causal connection between the conditions under which the work is required to be performed and the resulting injury."

*Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 534 (Tenn. 2006) (citations omitted).

Here, Mr. Rayburn testified that he was transporting waste oil to lubricate and protect department machinery and that he and other employees had done this several times over the years. While no one told him to oil the machinery, he was often expected to initiate work tasks. Although his coworkers and supervisor never used waste oil on department machines, they did not contradict his testimony that he did.

5

Mr. Rayburn conceded that he would have taken some of the oil home with him for personal use after he finished lubricating the machines. He said that he had done it before and so had several other employees, and no one had ever told him not to do so. Again, no one, including his supervisor. contradicted this testimony. Further, they were all aware that he intended to get some waste oil, and no one instructed him otherwise.

The Court finds a causal connection between Mr. Rayburn moving the oil to maintain the machinery, principally for the benefit of the Street Department, and his resulting slip, fall, and work injury. Mr. Rayburn established by a preponderance of the evidence that he was performing his work duties when he fell and fractured his hip. The fact that he intended to take at least some of the oil home with him was incidental to his accident. Thus, the injuries he sustained were primarily caused by his employment and are compensable.

*Disability Benefits under section 50-6-207(3)(B)*

The Court must now determine the extent of Mr. Rayburn's permanent disability and begins the analysis under section 50-6-207(3)(B). The undisputed medical proof is that he sustained an 11% impairment from his work injury. This entitles him to 49 weeks of benefits. The proof also established by a preponderance of the evidence that he was unable to work at a job making at least his pre-injury wage at the end of his compensation period on January 13, 2026. Thus, the original award is multiplied by 1.35, and his "resulting award" is 66.5 weeks of benefits.

Given that Mr. Rayburn also proved he was over the age of 40 and did not have a high school education, the resulting award is multiplied by 1.74, which is the product of 1.45 and 1.2. Thus, the Court finds that the increased award owed to Mr. Rayburn totals 115.71 weeks of benefits.

*Permanent Total Disability*

To receive permanent total disability benefits, Mr. Rayburn must prove under Section 50-6-207(4)(B) that he suffered an injury that "totally incapacitates [him] from working at an occupation that brings [him] an income." In determining whether he is totally disabled, the Court must focus on his "ability to return to gainful employment." *Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770, 774 (Tenn. 2000). In *Hubble,* 188 S.W.3d at 535, the Supreme Court listed several factors relevant to the question of total disability: "the employee's skills, training, education, age, job opportunities in the immediate and surrounding communities, and the availability of

work for an individual with that particular disability."

The Court finds that Mr. Rayburn proved that he was unable to return to his job with the Streets Department due to his work-related injury. Dr. Christie testified that using a cane would prevent him from performing manual labor. Further, Mr. Pafford testified Camden did not have light-duty work for him.

However, the question is not whether Mr. Rayburn's restrictions from his work injury prevent him from doing his old job. He must prove they totally incapacitate him from working in the general labor market. For the following reasons, the Court finds Mr. Rayburn did not submit sufficient evidence to meet this burden.

First, Mr. Rayburn did not introduce an opinion from a vocational expert to assess his vocational impairment based on factors set out in *Hubble*. Mr. Rayburn maintained that the law allows the Court to determine he is totally disabled without this opinion. *Owens v. Sitters, Etc.,* 2023 TN Wrk. Comp. App. Bd. LEXIS 55, at *23 (Nov. 17, 2023). While true, Mr. Rayburn offered no proof on job opportunities in the immediate and surrounding communities, and the availability of work for an individual with that particular disability.

Mr. Rayburn also provided little in the way of lay testimony as to his cognitive and learning skills. He did not testify that he had difficulty learning, reading, doing math, or acquiring new skills. His sole testimony in this regard was that he only had jobs involving manual labor and knows little about computers.

Further, much of Mr. Rayburn's asserted physical impairments stem from symptoms that he did not confirm through medical proof. He testified about his problems with vertigo and imbalance, but he did not submit any medical evidence that he suffers from this condition, why it occurs, or how it affects his ability to work.

Mr. Rayburn also testified that he now has pain and numbness so he cannot sit or stand for more than 15 minutes, and in fact, his numbness is so pervasive that he experiences uncontrolled urination. However, Dr. Christie, the only medical expert, did not attribute these symptoms to Mr. Rayburn's injury and hip replacement. In fact, he did not address them at all. In addition, Mr. Rayburn has not sought treatment for these continued complaints; the last treatment he received was in April 2025.

Dr. Christie's testimony as to Mr. Rayburn's restrictions was mainly linked to

the fact that he used a cane, which would get in the way of most manual labor activities. He also said that Mr. Rayburn would not damage his hip through physical activity.

In addition to expert opinion, the "employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is competent testimony that must be considered" when determining vocational disability. *Hubble*, 188 S.W.3d at 535-36. Mr. Rayburn testified that he did not believe he could return to any of his past jobs.

Notably, Mr. Rayburn went further than that and testified that he did not believe he could return to any gainful employment. This assertion is significantly broader, and Mr. Rayburn's evidence for it is lacking.

Given these factors, the Court finds that Mr. Rayburn has not proven by a preponderance of the evidence that his work-related injury has made him permanently and totally disabled.

*Extraordinary Benefits under section 50-6-242*

The next question is whether Mr. Rayburn is entitled to permanent disability benefits under section 50-6-242. This statute provides that in "extraordinary" cases he may receive up to 275 weeks of benefits. To do so, he must first satisfy the elements of section 50-6-207(3)(B). The employee must prove by clear and convincing evidence that limiting recovery to section 50-6-207(3)(B) would be "inequitable in light of the totality of the circumstances." Finally, if he does so, he must then prove the following: 1) he has at least a 10% impairment rating; (2) the authorized doctor signed a form certifying that he could not return to the pre-injury occupation due to restrictions related to the work injury; (3) he is not earning at least 70% of the pre-injury wage.

As discussed above, Mr. Rayburn met the criteria for increased benefits under 50-6-207(3)(B). The evidence also confirmed that he meets the final three elements set out above.

The question remains whether he proved by clear and convincing evidence that limiting benefits to section 50-6-207(3)(B) would be inequitable under the totality of the circumstances. .

The undisputed medical evidence was that he could no longer perform manual

8

labor. This evidence was confirmed by Mr. and Ms. Rayburn's undisputed testimony about Mr. Rayburn's physical limitations. Given his age, lack of education, and the fact that he has worked in manual labor jobs all his life, including over 20 years in the same job, the Court finds Mr. Rayburn proved by clear and convincing evidence that limiting him to the benefits owed under section 50-6-207(3)(B) would be inequitable.

. The Court finds he is awards 225 weeks of benefits under section 50-6-242 based on the totality of the circumstances.

*Social Security Offset*

Tennessee Code Annotated section 50-6-207(4)(A)(i) provides that payments of permanent disability benefits shall be reduced by the amount of any Social Security Old Age benefits attributable to employer contributions. In *McCoy v. T.T.C. Ill., Inc.*, 14 S.W.3d 734, 737 (Tenn. 2000), the Supreme Court held that the reduction applies to employees over age 60 who suffer injuries to the body as a whole and are awarded *either* permanent total or *permanent partial* disability benefits. The Court held the statute was intended to provide a 50% offset of the total amount of Social Security Old Age benefits received by the employee. *Id.* at 738.

Mr. Rayburn argued that before his injury, he intended to work until age 67, when he would have been eligible for full retirement benefits. However, when he became unable to work, he was forced to take early retirement benefits at a reduced rate. Thus, he contended that the offset does not apply to his disability benefits because he is not receiving the full retirement benefits he could have received had he not been forced into retirement.

Although a novel argument, Mr. Rayburn did not cite any authority for this position. The statute makes no distinction between reduced or full retirement benefits. Thus, the Court rejects Mr. Rayburn's contention and finds that Camden is entitled to the full offset.

Here, Mr. Rayburn receives $1,454.90 monthly in Social Security Old Age benefits, which is equal to $335.75 per week. Fifty percent of those benefits is $167.87. Mr. Rayburn's weekly compensation rate is $510.09. So, after a reduction of $167.87, his adjusted permanent partial disability weekly rate for benefits is $342.22 and, at that adjusted rate, 225 weeks of permanent partial disability benefits equals $76,999.50.

*SIF Liability*

Since Mr. Rayburn did not prove permanent total disability, the Subsequent Injury Fund is not liable for any benefits. *Id.* § 50-6-208(a)(1).

IT IS, THEREFORE, ORDERED THAT:

1. Camden shall pay Mr. Rayburn a lump sum of $76,999.50 in permanent partial disability benefits. Mr. Rayburn's counsel is entitled to a 20% attorney fee, which equals $15,399.90.

2. The Subsequent Injury and Vocational Recovery Fund is not liable.

3. Mr. Rayburn may file a motion to recover his discretionary costs.

4. Dr. Christie remains Mr. Rayburn's treating physician for his work-related injury. Camden shall pay for reasonable, necessary, and related medical treatment for this injury.

5. Camden shall pay costs of $150.00 to the Court Clerk within five business days of this order becoming final.

6. Camden shall file with the Court Clerk a Statistical Data Form within ten business days of this order becoming final.

7. This Compensation Order is a final adjudication upon the merits of Mr. Rayburn's claim for benefits. Unless appealed, it shall become final in 30 days.

**ENTERED on March 19, 2026.**

_____
**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

10

## APPENDIX

Exhibits:

1. Social Security benefit summary
2. Dr. Christie's deposition
3. Medical records and medical bills
4. Medical records filed by the City of Camden
5. City of Camden's Interrogatory Responses
6. Physician's Certification Form
7. First Report of Injury
8. Camden's Payment Summary
9. Mr. Rayburn's Responses to Camden's Interrogatories
10. Mr. Rayburn's Responses to SIF's Interrogatories
11. Separation Notice
12. Pictures of accident scene
13. Emergency Room record

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on March 19, 2026.

| Name | Via Email | Service sent to: |
|------|-----------|------------------|
| Charles Hicks | X | Office@Hickslawfirm.net |
| Robert Binkley | X | RBinkley@raineykizer.com |
| Tim Kellum | X | Tim.kellum@tn.gov |

**PENNY SHRUM, Court Clerk**
WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____          ☐ Motion Order filed on _____

☐ Compensation Order filed on_____          ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____
*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*