**Belinda Ann BLACK, Plaintiff-Appellant,**

v.

**Swann DANCE, Curtis Etherton and Ray Poe, Partners, Defendants-Appellees.**

Supreme Court of Tennessee.

Dec. 20, 1982.

Wallace F. Burroughs, Knoxville, for plaintiff-appellant.

Earl R. Layman, Arthur G. Seymour, Jr., Knoxville, for defendants-appellees; Key, Lee & Layman, Frantz, McConnell & Seymour, Knoxville, of counsel.

OPINION

BROCK, Justice.

This is a worker's compensation case. The petitioner, Belinda Ann Black, brought this action on her own behalf as widow of the deceased, Steven Black, and as the administratrix of his estate and for the benefit of Anthony Black and Christopher Black, the two minor children of the deceased, Steven Black. After a hearing on the merits, the trial judge dismissed the action, finding that the deceased Steven Black was not the employee of the defend-

ants. We find material evidence in the record to support the findings and conclusions of the trial court and, accordingly, affirm them.

The defendants owned and operated a small truck hauling business and in their business employed three drivers to operate their fleet of three over-the-road vehicles each consisting of a tractor and trailer. One of the drivers thus employed was Roy McCall Newman of Jefferson County, Tennessee, who was the father-in-law of Steven Black, the deceased alleged employee. Mr. Newman, while engaged in driving the tractor trailer assigned to him on a return trip from Canada to Dandridge, Tennessee, suffered a blow out of one of the front tires of the tractor in Rockcastle County, Kentucky. Mr. Newman was forced to temporarily abandon the disabled rig and return to Dandridge, Tennessee, to arrange for repairs. Upon arrival in Dandridge, Mr. Newman contacted Ray Poe, one of the defendant partners, and they arranged for Mr. Newman to return to Kentucky with a tire and wheel and the necessary tools to replace the blow out. It was agreed between them that Mr. Newman would take a pickup truck belonging to defendant Poe for the purpose of transporting the repair tire and wheel and tools to the disabled vehicle in Kentucky. When Mr. Poe inquired of Mr. Newman how he would return his pickup truck after having repaired the tractor trailer rig, Mr. Newman replied that he would arrange for the return of the pickup and that Mr. Poe should leave that to him.

Mr. Newman then visited the home of his daughter and his son-in-law, Steven Black, and asked Steven if he would accompany him to Kentucky to assist in repairing the tractor trailer rig; Steven agreed. Mr. Newman testified, when asked if he discussed with Steven any compensation for his services in this regard, that "I told him I would take care of him."

Mr. Newman, his fifteen year old son and Steven Black proceeded to Kentucky in Mr. Poe's pickup truck to effect the repair. After the damaged wheel had been replaced and it was time to attempt to move the tractor and trailer back onto the highway, Interstate 75, Steven Black drove the Poe pickup truck about a quarter of a mile back up the highway from the tractor trailer rig and proceeded to flag the oncoming traffic in order to enable the tractor trailer to move back onto the pavement. The lights of the pickup truck were employed because it was dark. While thus engaged in flagging traffic, Mr. Black was struck by an oncoming motorist receiving injuries from which he died a short time later.

It is clearly established in the record that Mr. Newman and the other drivers of the defendant's tractor trailers were supplied with expense money at the beginning of each trip in amounts of $500.00 or more which they were authorized to use and did use for the purpose of purchasing gasoline, oil and to pay for other expenses including the making of minor repairs. Thus, Mr. Poe testified

"... If it was a minor problem he was to take care of it, get a ticket, pay a ticket, and bring it back to us. If it was a major problem, of course, we always asked him to notify us. We had to make arrangements."

Mr. Newman testified that on one or more occasions prior to this accident he had paid Steven Black an unspecified sum from this expense money for his assistance in washing the defendant's tractor. In our opinion, the evidence would support a conclusion that Mr. Newman and defendants' other drivers had either express or implied authority to employ helpers in emergency situations such as that confronted by Mr. Newman in this case. Whether he exercised such authority on this occasion is quite another question.

Although Mr. Newman testified at the hearing in this case that he told Mr. Black, "I would take care of him" for his services in assisting in making these necessary repairs, he admitted on cross examination that in his deposition prior to trial he testified that no conversation or other understanding was had between him and Mr. Black respecting remuneration for his serv-

ices in accompanying him to Kentucky to make the repairs. Thus, in his deposition, Mr. Newman testified:

"Q. Did you have any conversation with him about whether or not he would be paid?

"A. No.

"Q. Did you have any conversation with him at any time before he got killed about whether or not he would be paid?

"A. No, they (sic) wasn't nothing brought up about it.

"Q. He didn't ask you and you didn't bring up the subject?

"A. That's right."

When asked to verify the above quoted testimony in his deposition, Mr. Newman replied:

"A. We didn't mention no money, no.

"Q. You did give those answers to those questions?

"A. Yes sir."

When asked whether or not a claim had been made in behalf of the widow against the defendants for compensation for Steven Black's services in accompanying Mr. Newman to Kentucky on the occasion of his death, Mr. Newman testified that he had told Curtis Etherton, one of the defendant partners, that they should pay the widow something for Steven Black's making the trip to Kentucky and that Mr. Etherton said that he had done so, that he had put it in Nelson Newman's check. However, Mr. Etherton testified in rebuttal that he had no such conversation with Roy Newman or with anyone else respecting payment for the services of Steven Black in making the trip to Kentucky on the occasion of his death and had paid no one for such alleged services.

The Chancellor made his finding that the deceased was not an employee of the defendants in the following language:

"This finding is, as stated heretofore, based upon the entire record and in part but not by way of limitation on the following:

A. There was no contract of employment, either expressed or implied, by and between the defendants, their agents or employees and the deceased.

B. There was no contract or agreement providing for remuneration or compensation to the deceased on behalf of the defendants. The court finding that the statement of defendants' employee, Roy Newman, to the deceased of, 'I told him I'd take care of him,' to be so ambiguous as to negate the normal and usual elements of an employment contract and resultant compensation therefor.

C. The family relationship by and between the defendants' employee, Roy Newman, and the deceased, together with this and past activities of said employee by the taking with him of his son and other family members while in the performance of his duties for the defendants."

As already indicated, we conclude that the evidence supports these findings of the trial court, although, in our opinion, the findings and conclusion could have been to the contrary. The crucial witness, Roy Newman, testified at the trial that he had told his son-in-law, Steven Black, that "he would take care of him" for his services in helping make the repairs in Kentucky; but, in his pre-trial deposition this same witness testified that there was no conversation with Steven Black respecting remuneration for his services on this trip. The Chancellor, who saw and heard the witnesses, was entitled to accept Mr. Newman's testimony given in his pre-trial deposition or to disbelieve his testimony at trial, and, thus, to conclude that no agreement for remuneration was made.

Again, the Chancellor was entitled to accept the testimony of Curtis Etherton that no claim was made on behalf of Mrs. Black for remuneration for her husband's trip to Kentucky on the occasion of his death and to reject the testimony of Mr. Roy Newman that he had made such a claim to Mr. Etherton and that Mr. Etherton had agreed to pay it and had said that he had included payment for such remuneration on behalf

of the widow in a check issued to Mr. Newman's brother, Nelson Newman, who also was a driver for the defendants.

The Worker's Compensation Act, T.C.A., § 50–902(b), provides:

"In chapters 9 through 12 of this title, unless the context otherwise requires:

\* \* \* \* \* \*

"(b) 'Employee' shall include every person, including a minor, whether lawfully or unlawfully employed, . . ., in the service of an employer, as employer is defined in paragraph (a) above, under any contract for hire, apprenticeship, written or implied."

The word "hire" imports remuneration or compensation. *The American Heritage Dictionary of the English Language* defines the word "hire," a transitive verb, as follows:

"1. To engage the services of (a person) for a fee; to employ. 2. To engage the temporary use of (something) for a fee; to rent; *hire a car for the day.* 3. To grant the services or allow the use of for remuneration; to rent out. Often used with *out: I hire out my country home for the summer.—hire out:* To grant one's services in exchange for compensation: *He hires out as a field hand when work is slow on his farm.*"

When used as a noun, the word "hire" is defined as follows:

"1. The payment for services or use of something. 2. The act of hiring. 3. The condition or fact of being hired.—*for hire.* Available for use or services in exchange for compensation."

In order for one to be an employee of another for purposes of our Worker's Compensation Law, it is, therefore, required that there be an express or implied agreement for the alleged employer to remunerate the alleged employee for his services in behalf of the former. As we have already stated, the evidence in this case supports the finding of the Chancellor that no such agreement existed in this case.

Our conclusion in this respect is not unique. Indeed, the law generally appears to be in accord. Thus, at 99 C.J.S. *Work-*

*men's Compensation* §§ 64 (1958) we find the following statement:

"In order that a person may be an employee under a compensation act, it is essential that some consideration be paid or payable to him, services gratuitously performed creating no liability, and some of the definitions of 'employer,' 'employee,' and related terms in the compensation acts contain the element of pay for service."

The quoted statement is supported by citations to decisions from many other states. *See also* 81 Am.Jur.2d *Workmen's Compensation § 156 (1976) and cases there cited. This rule may on occasion produce unjust results, but, it is not of our making; we must administer the law enacted by the General Assembly.*

Finding evidence in the record to support the findings and conclusion of the trial judge denying this claim for compensation, we are constrained to affirm his decision. Costs incurred upon appeal are taxed against the appellant and surety.

FONES, C.J., and COOPER, HARBISON and DROWOTA, JJ., concur.