FILED

March 1, 2018

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 9:27 A.M.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| David Carpenter | ) | Docket Nos. 2017-08-0232 |
| | ) | 2017-08-0233 |
| v. | ) | |
| | ) | State File Nos. 4008-2017 |
| Southern Transit, et al. | ) | 14688-2017 |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Deana C. Seymour, Judge | ) | |

---

### Affirmed and Remanded – Filed March 1, 2018

---

In this interlocutory appeal, the employee alleged an injury to his low back while driving a truck owned by one of several employers named as defendants. During the expedited hearing, the trial court was asked to address whether the employee came forward with sufficient evidence to establish a likelihood of prevailing at trial with respect to the issue of medical causation and, if so, which employer is responsible for the claim. The trial court concluded the employee established he would likely prevail at trial on the issue of medical causation and placed responsibility on the company that owned the truck the employee was driving, controlled the conduct of the employee's work, and paid his wages on the date of the injury. We affirm the trial court's decision and remand the case.

Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, joined. Judge David F. Hensley filed a separate opinion concurring in part and dissenting in part.

Michael W. Jones, Nashville, Tennessee, for the employers-appellants, P&M Logistics and Carter O'Neal Logistics

Monica Rejaei, Memphis, Tennessee, for the employee-appellee, David Carpenter

J. Allen Brown, Nashville, Tennessee, for the employer-appellee, Southern Transit

**Factual and Procedural Background**

David Carpenter ("Employee"), a sixty-six year old resident of Shelby County, Tennessee, worked as a truck driver and typically completed a FedEx route from Memphis, Tennessee to Greenville, Mississippi several times a week. Pursuant to a program put in place by FedEx, multiple independent trucking companies contracted to cover various FedEx delivery routes. To be eligible to cover FedEx routes, trucking companies and drivers were required to be pre-approved by FedEx.

In the present case, Carter O'Neal Logistics ("Carter") and P&M Logistics ("P&M") were two trucking companies owned and operated by Boris Penchion ("Penchion").[1] A third company, Southern Transit, was owned by Penchion's friend, Macilyn Harper ("Harper"). FedEx pre-approved these three companies to cover certain delivery routes. In an effort to assist Harper with the operation of her company, Penchion instructed his Operations Manager, Mike Mathias ("Mathias"), to run the day-to-day operations of Southern Transit as well as his companies.[2] Mathias hired and supervised truck drivers, assigned drivers to various routes, and, according to Penchion, was authorized to "run the operation on my businesses." Penchion further explained that Mathias "deals with the drivers and the trucks and makes sure everybody is where they need to be."

Although Penchion was responsible for FedEx's Memphis-to-Greenville route, he allowed Harper's company to run that route to give her a "consistent income every week." Harper did not hire Employee personally to drive her truck and, in fact, never met Employee prior to the expedited hearing. Instead, Mathias hired Employee and assigned him to Southern Transit's truck.

Employee operated the Memphis-to-Greenville route in Southern Transit's truck until November 2016. At some point that month, Southern Transit's truck became inoperable. As a result, Mathias instructed Employee to run the route with one of Carter's trucks. During the weeks Employee was operating Carter's truck, his wages were paid by Carter. He received no wages from Southern Transit when he was not operating the Southern Transit truck.

As Employee was operating Carter's truck, he began to experience pain and other symptoms in his low back. He asserted that the driver's seat in the Carter truck was not adjusting properly and caused his low back symptoms that manifested on or about

---

[1] For purposes of a previously-filed motion for summary judgment and the expedited hearing, the trial court treated Carter and P&M as "related entities considered one employer for purposes of this litigation." No party objected to this characterization and the issue has not been raised in this appeal. Therefore, like the trial court, we treat Carter and P&M as one employer for purposes of this appeal.

[2] Mathias was paid by one of Penchion's companies and never appeared on Southern Transit's payroll.

November 29, 2016. Thereafter, on or about December 8, 2016, he experienced increased pain while exiting the Carter truck. He reported these incidents to Mathias.

When Employee received no response from Mathias, Penchion, or Harper, he contacted Southern Transit's workers' compensation insurer directly. The insurer provided a panel of physicians, from which Employee selected Dr. Samuel Schroerlucke. After several visits, however, Southern Transit's insurer denied Employee's claim and declined to authorize any further medical treatment. The insurer also terminated temporary disability benefits. Employee did not return to work for Carter, P&M, or Southern Transit.

At the expedited hearing, Employee, Penchion, and Harper testified in person. In addition, the trial court considered the deposition testimony of Dr. Schroerlucke and other exhibits admitted into evidence. Thereafter, the trial court concluded that although Employee was originally hired and paid by Southern Transit, at the time of his work injury, he was working under an implied contract of employment with P&M or, in the alternative, P&M was his "special employer" as of the date of the work injury.[3] The trial court further concluded Employee satisfied his burden of proof on the medical causation issue through the testimony of Dr. Schroerlucke, who opined Employee's condition was "fifty-one percent or more related to his employment." Carter and P&M have appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

---

[3] Because the trial court considered Carter and P&M to be "related entities," it collectively referred to those two companies as "P&M."

3

## Analysis

### *Implied Contract of Hire/Loaned Servant Doctrine*

On appeal, Carter and P&M assert the trial court erred with respect to the "contract of hire and employment status of . . . Employee." Specifically, they argue "the weight of the evidence reveals neither P&M nor any related entity was the actual employer of [Employee] during any period [in] which he alleged to have been injured." Instead, Carter and P&M argue that Penchion merely "lent his truck to Southern and never hired Mr. Carpenter."

Tennessee Code Annotated section 50-6-102(12)(A) (2017) defines "employee" to mean "every person . . . in the service of an employer . . . under any contract of hire or apprenticeship, written or implied." In *Black v. Dance*, 643 S.W.2d 654 (Tenn. 1982), the Tennessee Supreme Court addressed the employment relationship as follows:

> In order for one to be an employee of another for purposes of our Workers['] Compensation Law, it is . . . required that there be an express *or implied* agreement for the alleged employer to remunerate the alleged employee for his services in behalf of the former.

*Id.* at 657 (emphasis added). Thereafter, the Tennessee Court of Appeals concluded the Supreme Court's opinion in *Black* "unequivocally enunciates the rule that there must be an express *or implied* contract for compensation for services in order to support a status of employee under the Workers['] Compensation Act." *Hill v. King*, 663 S.W.2d 435, 439 (Tenn. Ct. App. 1983) (emphasis added).

In *Federal Ins. Co. v. Pennsylvania National Mutual Casualty*, No. M1999-01917-WC-R3-CV, 2000 Tenn. LEXIS 449 (Tenn. Workers' Comp. Panel Aug. 17, 2000), the deceased worker had worked as a concrete finisher for a construction company for nine years. *Id.* at *2. On the day of the accident, the decedent had been asked to work for another construction company because that company "needed a person to assist his regular employees with concrete finishing work." *Id.* During the course of his work for the second company, the decedent was electrocuted. *Id.* at *4.

In analyzing whether the circumstances of the case were covered by the "loaned servant" doctrine, the Court in *Federal Ins. Co.* explained,

> When a general employer loans an employee to a special employer, the special employer becomes liable for work[ers'] compensation only if (a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special

4

employer; and (c) the special employer has the right to control the details of the work.

*Id.* at *6. Thereafter, the court considered whether an implied contract of hire existed, which "require[d] an express or implied agreement for the alleged employer to pay the alleged employee." *Id.* The court then explained, "[t]he test for whether or not one is a loaned servant focuses less on who was to pay the employee, but instead focuses more on for whom the work was being done." *Id.* at *7.

In the present case, it is undisputed that Mathias, Penchion's Operations Manager who directed Employee's day-to-day work activities, was hired and paid by one of Penchion's companies. It is further undisputed that FedEx had assigned the dedicated Memphis-to-Greenville route to Penchion, who allowed Southern Transit's truck to run that route. There is no question that Mathias instructed Employee to operate a Carter truck when Southern Transit's truck became inoperable, resulting in Employee receiving wages from one of Penchion's companies during the weeks Employee operated the Carter truck. Employee has asserted that the cause of his work injury was the driver's seat in Carter's truck. Finally, when Employee sought to report his work injury, he contacted Mathias, who, in turn, contacted Penchion.

Thus, when considering the three-pronged test as enunciated in *Federal Ins. Co.*, we conclude that, when Mathias instructed Employee to operate the Carter truck, Carter, one of Penchion's companies, entered into an implied contract with Employee to pay him for that work. Moreover, the work performed by Employee was essentially that of Penchion, who was ultimately responsible for the Memphis-to-Greenville route. Finally, Mathias, who was employed and paid by one of Penchion's companies, had the authority to control the details of Employee's work. Therefore, we conclude that the evidence does not preponderate against the trial court's determination that an implied contract of employment existed between Carter and Employee during the weeks he operated the Carter truck and was paid by Carter.

Carter and P&M insist that Employee admitted during his testimony he had been hired by Southern Transit, completed employment paperwork for Southern Transit, and was paid by Southern Transit. Employee further acknowledged that he never completed any employment paperwork for Carter or P&M. Yet, the very nature of an "implied contract of hire" indicates the concept applies in circumstances where traditional indicia of the hiring process are absent. Instead, the Tennessee Supreme Court has indicated it is the agreement for remuneration and the right to control the details of the work that underlie an implied contract of employment. Here, it is undisputed that Mathias, the Operations Manager for Carter and P&M, instructed Employee to operate a Carter truck,

5

and Carter paid Employee for his work while operating a Carter truck. This arrangement supports the trial court's finding of an implied contract of hire.[4]

*Medical Causation*

Carter & P&M next argue that Dr. Schroerlucke's medical causation opinion is "flawed." Specifically, they assert that Dr. Schroerlucke offered "wavering opinions" during his deposition and relied, in part, on Employee's subjective description of when his symptoms manifested. As the Supreme Court's Special Workers' Compensation Appeals Panel has explained, however, a "trial judge has the advantage of viewing the written medical proof through the prism of his/her findings as to the credibility of the lay witnesses, especially regarding subjective complaints relied upon by the physician." *Peeler v. Erin Truck Way, Ltd., Inc.*, No. M2004-02045-WC-R3-CV, 2005 Tenn. LEXIS 848, at *8 (Tenn. Workers' Comp. Panel Oct. 11, 2005).

In *Indiana Lumberman's Mutual Ins. Co. v. Ray*, 596 S.W.2d 816 (Tenn. 1980), the Tennessee Supreme Court addressed a trial court's reliance on medical expert opinions based on an employee's subjective complaints:

> [T]he treating physician, and the only expert witness that testified, stated that his opinion of the permanency of plaintiff's disability was based upon "recurrent episodes of pain, muscle spasm, limitations of motion, etc. . . ." Defendant . . . relies upon one page of its cross-examination for the proposition that [the physician's] evaluation of permanency was based entirely on subjective complaints, but, of course, his testimony must be evaluated in its entirety.

*Id.* at 819. The Court then concluded, "[t]his record contains ample material evidence, both expert and lay, to support the trial judge's finding of sixty percent permanent partial disability."[5] *Id.*

---

[4] We further conclude that Penchion's decision to give Southern Transit the profits from the Memphis-to-Greenville runs completed while Employee was operating Carter's truck is not pertinent to this analysis. While Penchion had agreed to allow Southern Transit to operate that particular route, Penchion was ultimately responsible for the dedicated route and could have disposed of the profits in any way he chose. While Penchion's desire to assist Harper with maintaining a steady income and in building her business is admirable, it does not change the nature of the implied employment relationship between Carter and Employee during the relevant time period.

[5] Although the standard of review at the time *Indiana Lumberman's* was decided was different than the standard of review we apply on appeal, we conclude the Supreme Court's rationale remains relevant to the issue of a trial court's consideration of expert medical testimony indicating the expert relied on an employee's subjective complaints in forming his or her opinions.

In the present case, Dr. Schroerlucke testified he reviewed with Employee his history of symptoms and subjective complaints. An MRI of the lumbar spine revealed "severe L4-L5 stenosis." Although Dr. Schroerlucke admitted the MRI revealed no evidence of an "acute injury," and that he relied on Employee's subjective description of the work incidents and his symptoms, he also reaffirmed his opinion that if driving the truck "ignited that pain," then "his employment caused more than 51 percent of this injury." Specifically, he responded "yes" when asked as follows:

> Ultimately, Doctor, with [Employee's] facts surrounding his injury – being that he was driving a truck, he had a seat that was broken, that was repeatedly striking him in the back, and, then, within a very short period of time after that happened got out of his truck and began immediately feeling this pain that he described to you – in your medical opinion, is Mr. Carpenter's injury more likely than not, meaning more than 51 percent, related to his employment?

In evaluating this case, the trial court correctly noted that, at an expedited hearing, an employee need not prove every element of his claim by a preponderance of the evidence, but "must present sufficient evidence for the Court to determine he is likely to prevail at a hearing on the merits." After reviewing Dr. Schroerlucke's records and deposition testimony, the trial court concluded "[Employee] has shown he is likely to prevail at a hearing on the merits on the issue of causation." Implicit in this determination is a conclusion that the trial court found Employee's testimony credible as to the work incidents and the development of his pain and other symptoms. At this stage of the proceedings, we conclude the evidence does not preponderate against that determination.

## Conclusion

Based on the foregoing, we affirm the decision of the trial court and remand the case for any further proceedings as may be necessary.



FILED

March 1, 2018

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 9:27 A.M.

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

David Carpenter                          )     Docket Nos.  2017-08-0232
                                         )                  2017-08-0233
v.                                       )
                                         )     State File Nos. 4008-2017
Southern Transit, et al.                 )                     14688-2017
                                         )
                                         )
Appeal from the Court of Workers'        )
Compensation Claims                      )
Deana C. Seymour, Judge                  )

---

**Opinion Concurring in Part and
Dissenting in Part – Filed March 1, 2018**

---

Hensley, J., concurring in part and dissenting in part.

I agree with the majority's determination that the medical proof of causation was sufficient to establish that David Carpenter would likely prevail at a hearing on the merits. However, in my opinion, the preponderance of the evidence does not support the trial court's conclusion that Mr. Carpenter was an employee of P & M Logistics, Inc. ("P & M Logistics"), during those days he drove its truck while the Southern Transit, Inc. ("Southern Transit"), truck he customarily operated was out of service. I would modify the trial court's order to require Southern Transit to provide the benefits awarded to Mr. Carpenter. Accordingly, I respectfully dissent from the majority opinion insofar as it affirms an award of benefits to be paid by P & M Logistics.

Determining who Mr. Carpenter's employer was on the date of his alleged injury requires a detailed analysis of the facts. It is undisputed that Mr. Carpenter was hired as a truck driver by Southern Transit approximately two years before his alleged injury. His employment with Southern Transit began following a meeting with Mike Mathias wherein Mr. Carpenter completed an application to work for Southern Transit and signed other paperwork in connection with his employment. From the inception of this employment relationship, Mr. Mathias was Mr. Carpenter's supervisor, to whom he was to report any issues concerning his work or the truck he operated. As is addressed in the following testimony, although Mr. Mathias was employed by P & M Logistics, he managed the day-to-day operations of both Southern Transit and P & M Logistics as directed by Boris Penchion, the owner of P & M Logistics.

1

Evidence concerning Southern Transit, P & M Logistics, and a third company, Carter O'Neal Logistics ("Carter O'Neal"), each being an independent contractor with FedEx, is important to understanding how Mr. Penchion came to manage Southern Transit and how Mr. Mathias came to oversee the day-to-day operations of Southern Transit. In an affidavit filed by Mr. Penchion, he stated he was "the President and owner of Carter O'Neal Logistics (aka P&M Logistics)." In the expedited hearing, he testified he was the owner of P & M Logistics and Carter O'Neal, and that each had its own dedicated routes with FedEx. In an order denying Southern Transit's motion for summary judgment and in the expedited hearing order, the trial court stated that P & M Logistics and Carter O'Neal were essentially the same entity. No one has raised an issue on appeal concerning the trial court's treating P & M Logistics and Carter O'Neal as a single entity, although the record indicates they are separate corporations that both the trial court and the majority treat as a single entity.

Mr. Penchion's initial involvement with FedEx began in 2007 when P & M Logistics entered into a contract with FedEx. He testified P & M Logistics had a truck with a dedicated route and "a wild truck," which he explained is a truck that runs routes but does not have a dedicated route. The following year, he started Carter O'Neal "when [he] started buying other contractors out." He testified that in addition to the two P & M Logistics trucks, he had "probably four spare trucks over there that [he] can run any way that [he] want[s] to." He explained that spare trucks "are the trucks we use, like just in case something breaks down or you use as needed, because when you look at those trucks, they run 250 to 300,000 miles a year." He explained that the need for spare trucks was due to the number of days the trucks were in operation and the limited time the trucks are available for servicing before they have to go out on the road again.

Mr. Penchion testified he had eight or nine trucks with Carter O'Neal and that these trucks, the P & M Logistics trucks, and the spare trucks were all on FedEx's yard. He stated that when he started working with FedEx he would, on occasion, have to use another contractor's spare truck because he did not have the number of trucks he now has. He stated that as far as FedEx was concerned, they wanted contractors, trucks, and drivers that were in their system, and if another contractor needed a truck and he had a spare truck, it would not be any "big deal" for him to let another contractor use one of his trucks. He further explained that FedEx paid the owner of the truck used to make the run, irrespective of the driver who completed the run.

Macilyn Harper is the president of Southern Transit, which she testified was her "part-time side job, extra income job." She described her "full-time" job as a preschool teacher. Southern Transit first became an independent contractor with FedEx in 2010, at which time it was not assigned designated routes. Rather, Southern Transit's trucks were initially "on a rotation board" and would only produce income when the trucks went out. Southern Transit "ran off the board" until approximately two years ago when Mr. Penchion agreed to help Ms. Harper by allowing Southern Transit's one remaining truck

to run the dedicated route from Memphis, Tennessee to Greenville, Mississippi that one of Mr. Penchion's companies had with FedEx. She stated this "gave [her] a consistent income every week." According to Ms. Harper, the dedicated route "was not my contracted [route], but [Mr. Penchion] allowed me to do it . . .," which was "something that he did to help me out."

Ms. Harper testified she "assumed" Mr. Mathias was the person who hired Mr. Carpenter and stated "Mr. Carpenter was put in my truck, but I never met Mr. Carpenter." When asked how she knew to pay Mr. Carpenter, she responded "[h]is filing status, full name, address, social, all that was passed on to me, and I passed it on to my payroll company." She never disputed that Mr. Carpenter was hired by Mr. Mathias as an employee of Southern Transit. She said on a couple of occasions Mr. Carpenter called her and told her he did not receive a paycheck stub and she printed the stubs and "took them to the FedEx yard, and put them in the truck." She acknowledged that if Mr. Carpenter had any issues while driving Southern Transit's truck he was to call Mr. Mathias. However, she said she did not hire Mr. Mathias and that Mr. Mathias was not an employee of Southern Transit. She testified Mr. Mathias worked for one of Mr. Penchion's companies, stating "I'm not sure under which company it is, but he works for Boris [Penchion], one of Boris's companies."

It is clear from the testimony of both Ms. Harper and Mr. Penchion that Ms. Harper had very limited, if any, involvement in Southern Transit's day-to-day operations. She was asked whether she could "overrule" instructions that Mr. Mathias might give Mr. Carpenter and responded "normally, I don't get involved in the operation of the assignment, the truck, the run. . . . So I wouldn't have a reason to override or else really get involved." Her testimony evidenced both her lack of involvement in Southern Transit's operations and Mr. Penchion's willingness to help her.

Q. How would you know - - if [Mr. Carpenter] showed up for work, how would you know how much to pay him that week?

A. I would not know, unless I was told, maybe [Mr. Mathias] or [Mr. Penchion]. . . . And maybe Mr. Mathias would tell [Mr. Penchion]. So I wouldn't know. If Mr. Carpenter was in the truck, I wouldn't know.

. . . .

Q. Okay. Did you have any control over the day-to-day work activities of Mr. Carpenter?

A. No.

Q. Did you have any control over supervising him in any way?

3

A. No, I did not.

Q. Did you ever reprimand him or punish him or - -

A. No.

Q. - - did you ever give him a good write-up or a bad write-up?

A. No.

Q. Did you ever do any of those activities that normally an employer would do on behalf of an employee, like praise or punish or things of that nature?

A. No. I never met him, never spoke to him.

Q. Why would Mr. Penchion let you run this route of his and enjoy the earnings from it?

A. Well, that was an agreement between him and I [sic], to allow me to make the consistent income. I needed some financial help, and he did it to help me out.

Consistent with this testimony, Mr. Penchion testified Ms. Harper allowed him to run her company and that he, in turn, empowered Mr. Mathias to manage the day-to-day operations of Southern Transit.

Q. What I was trying to establish - - and please correct me if I am wrong - - you have had the route for much longer than David Carpenter has been around. And it's been your employees running the route - -

A. Yes . . . . Up until the point that [Ms. Harper] needed stable income, and me getting it approved. Then yes, I put - - I made sure her truck ran it, and I made sure I got her driver to be in the truck on a consistent basis.

. . . .

Q. Okay. And it was you or Mike [Mathias] that oversaw the day-to-day operations?

A. Mike, for the most part. I don't really be [sic] down there. I think, over the past five years, I might have been in the FedEx facility four times.

4

Q. And the entire time David Carpenter was on her payroll, Ms. Harper's payroll, who did he report to?

A. As far as what?

Q. As far as any issues with maintenance of the truck, the route, calling in sick?

A. Mike [Mathias]. Mike was like her driver manager that was free, because I paid the bill. So, no matter what, he was like her driver manager. But I am the financee [sic].

. . . .

Q. So who was in control of the day-to-day operations of this route? Did Ms. Harper have any control whatsoever over it?

A. If she wanted something to happen, it could, yeah, at the end of the day, because at the end of the day, it's her company. She owns it, the whole nine. But at the end of the day, she put me in place to allow me to run it, so to do what I thought was best. And in turn, I empowered Mike [Mathias], for him to make good decisions on what goes on day-to-day operation. . . . I empowered him to run it.

Mr. Penchion testified that all drivers in FedEx's system were given a number and had to be assigned to a contract, that all of his drivers were assigned "to P&M or Carter O'Neil [sic] Logistics," and that Mr. Carpenter was assigned to Southern Transit. He also explained how Mr. Carpenter came to be driving a Carter O'Neal truck at the time of his injury in 2016 and whether Ms. Harper would have been aware of the arrangement.

Q. Earlier, you were asked about this lending of your truck in November of 2016. Let's talk about kind of how that went down. You heard Ms. Harper testify earlier that when her truck would break down, she would sometimes not even know it. And it would get repaired and paid for by you, without . . . her knowledge. Do you dispute that?

A. I just told you I ran the company. She didn't have to worry about anything. Her job was to go - - if she was going to be a school teacher, be a school teacher.

Q. Okay.

5

A. She's telling you honestly. When she sat here and [told] you she really doesn't know what is going on, or the day-to-day, or none of that different stuff.

. . . .

Q. Okay. And so, when you lent her your truck and - - I guess, did you contact her and say, "I'm going to lend you my truck."?

A. Probably not, because I probably did not find out, until after the fact, that Mike [Mathias] had done it or did it. But it's not like it's never happened before. I'm saying a lot of stuff that was done was understood between me and her . . . .

. . . .

Q. So, when a decision has to be made, when a truck breaks down and that run has got to go, did Ms. Harper have any say over how that run was going to happen the next day, after the truck broke down?

A. She didn't want no [sic] say.

Q. Okay. So who did make the decision as to which truck was going to be used and which employee was going to be stuck in the cab?

A. Evidently, that day, Mike [Mathias] made the decision of who was going to do it. He is the operational manager.

Q. So you weren't lending the truck to her business. You were using the truck to keep your business going?

A. No. Trust me, I make money. That's not the issue. I'm lending her the truck. I'm making sure that truck - - her company is viable. At the end of the day, this is something that I don't have to do. But at the end of the day, I make sure that she was able to make the money, because that was her full-time job before she became a school teacher.

. . . .

Q. Who controls the day-to-day work of the employees?

A. The operational manager.

6

Q. And who is that?

A. You know that's Mike [Mathias].

Q. Okay. But he is your employee, and he runs your business?

A. The two companies, yeah. And he runs Southern [Transit,] too.

Mr. Carpenter's work arrangement over the two years he worked for Southern Transit differed from the arrangement on the date of his injury in two respects. First, on the date he was injured, he was driving a truck owned by Carter O'Neal rather than Southern Transit due to Southern Transit's truck being out of operation. Second, Carter O'Neal paid his wages for the days he drove its truck. The record does not disclose whether P & M Logistics or Carter O'Neal contracted with FedEx for the Memphis-to-Greenville route that Mr. Penchion allowed Southern Transit to run. It is clear that during the fifty-two week period ending December 9, 2016, Carter O'Neal paid Mr. Carpenter wages totaling $560 for approximately two weeks when he drove its truck. Mr. Penchion testified "it was just easier for me to go ahead and pay him" rather than pay the money to Southern Transit. He did, however, pay Southern Transit the balance of the money Carter O'Neal received from FedEx for the runs Mr. Carpenter completed after deducting the expenses of operating the truck. Two FedEx "Weekly Independent Contractor Settlement Statements" were entered into evidence covering the two weeks immediately preceding the time Mr. Carpenter drove Carter O'Neal's truck, and both statements identified the contractor as Southern Transit. The statements identify only one driver by number, but do not include the driver's name.

The trial court emphasized that Mr. Mathias was the operations manager for P & M Logistics, and that he hired and supervised Mr. Carpenter. Although the record supports those determinations, it is unrefuted that Ms. Harper allowed Mr. Penchion to operate Southern Transit for her, and that Mr. Mathias was empowered by Mr. Penchion to run the day-to-day operations of Southern Transit. Indeed, Mr. Penchion's testimony that Mr. Mathias was the operations manager of Southern Transit was undisputed. Moreover, Ms. Harper testified that if Mr. Carpenter had any issues with his work or the route he drove he was to notify Mr. Mathias. It bears repeating that, despite the peculiar circumstances of these business relationships, it is undisputed that Mr. Carpenter was hired by Mr. Mathias to operate Southern Transit's truck.

Mr. Carpenter testified he had been working with and reporting to Mr. Mathias throughout the two years he drove for Southern Transit. He testified that in late November 2016 when Southern Transit's truck "broke down," Mr. Mathias "just told me, '[g]et in this tractor truck over there,'" referring to a truck he said had Carter O'Neal written on its door. He testified he did not sign an application or fill out any paperwork when he started driving the Carter O'Neal truck, and that he did not interview with

7

anyone to work for Carter O'Neal or P & M Logistics. He testified this was the second occasion that Mr. Mathias had assigned him to a Carter O'Neal truck, the first occasion being about one year earlier when Southern Transit's truck would not start. He acknowledged he received checks from Carter O'Neal for the two weeks he drove its truck. However, his testimony that he had never been an employee of Carter O'Neal or P & M Logistics was unrefuted.

Based upon an implied contract, the trial court concluded "P&M [Logistics] employed Mr. Carpenter at the time of his injury." The trial court additionally determined that "[e]ven if the Court had found Southern Transit to be Mr. Carpenter's employer, . . . [P & M Logistics] would be liable for benefits as a 'special employer' under the loaned servant doctrine." The majority concludes that "when [Mr.] Mathias instructed [Mr. Carpenter] to operate the Carter [O'Neal] truck, Carter [O'Neal], one of Penchion's companies, entered into an implied contract with [Mr. Carpenter] to pay him for that work." Additionally, the majority concludes that "the work being performed by [Mr. Carpenter] was essentially that of Penchion, who was ultimately responsible for the Memphis-to-Greenville route." Finally, the majority states that when Mr. Carpenter sought to report his work injury, "he contacted Mathias, who, in turn, contacted Penchion."

In my opinion, both the trial court and the majority fail to appreciate that, in directing Mr. Carpenter's work, Mr. Mathias was managing the operations of Mr. Carpenter's employer, Southern Transit, as Mr. Penchion testified he had empowered him to do. The trial court and the majority emphasize that Mr. Mathias was employed and paid by P & M Logistics as its operations manager, apparently concluding that evidence outweighed the undisputed testimony that Mr. Mathias managed the day-to-day operations of Southern Transit. He had done so from the date he hired Mr. Carpenter to operate Southern Transit's truck. The fact that Ms. Harper chose not to be involved in the operations of Southern Transit, but instead allowed Mr. Penchion and Mr. Mathias to operate Southern Transit, does not alter Mr. Carpenter's employment relationship with Southern Transit. Indeed, Ms. Harper acknowledged that Mr. Carpenter was to report any issues with the work to Mr. Mathias. Thus, Mr. Mathias was the supervisor to whom Mr. Carpenter would be expected to report his work injury. Moreover, Mr. Penchion testified he never employed or intended to employ Mr. Carpenter. He described the arrangement as "lending" a truck to Southern Transit to run the dedicated route when Southern Transit's truck broke down, thereby keeping Southern Transit "viable."

In my opinion, the majority's conclusion that "the work being performed by [Mr. Carpenter] was essentially that of Penchion," is not borne out by the record; rather, the evidence, in my opinion, established that Mr. Carpenter was completing the same route he regularly operated for Southern Transit, only in the Carter O'Neal truck while Southern Transit's truck was out of service. The record does not disclose which of Mr. Penchion's companies had a contract with FedEx for the Memphis-to-Greenville route,

8

but it was not Mr. Penchion. Mr. Penchion testified the arrangement for Southern Transit to run the route was "approved," that Mr. Carpenter "was assigned to, in FedEx's system, Southern Transit," and that he thereafter "made sure I got her driver to be in the truck." None of this testimony was refuted. Finally, the majority states that Mr. Mathias "had the authority to control the details of [Mr. Carpenter's] work." While that is not disputed, neither is the fact that in controlling the work, Mr. Mathias was doing so as the manager of the day-to-day operations of Southern Transit.

My review of the record leads me to conclude that the preponderance of the evidence does not support the trial court's determination that P & M Logistics was Mr. Carpenter's employer on the date of his injury. Accordingly, I would reverse that part of the trial court's order implying a contract of hire between Mr. Carpenter and P & M Logistics and modify the order to hold Southern Transit liable for the benefits awarded to Mr. Carpenter.

**FILED**

**March 1, 2018**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 9:27 A.M.**



**TENNESSEE BUREAU OF WORKERS' COMPENSATION
WORKERS' COMPENSATION APPEALS BOARD**

| David Carpenter | ) | Docket Nos. 2017-08-0232 |
| | ) | 2017-08-0233 |
| v. | ) | |
| | ) | State File Nos. 4008-2017 |
| Southern Transit, et al. | ) | 14688-2017 |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Deana C. Seymour, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 1st day of March, 2018.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|------|------|------|------|------|------|------|
| Monica Rejaei | | | | | X | mrejaei@nstlaw.com |
| J. Allen Brown | | | | | X | allen@jallenbrownpllc.com |
| Michael Jones | | | | | X | mjones@wimberlylawson.com |
| Deana C. Seymour, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | Penny.Patterson-Shrum@tn.gov |

Jeanette Baird
Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-0064
Electronic Mail: WCAppeals.Clerk@tn.gov