

FILED
**Mar 01, 2022**
**02:18 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Tawan Braden | ) | Docket No. 2019-08-0544 |
| | ) | |
| v. | ) | State File No. 89807-2016 |
| | ) | |
| Mohawk Industries, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard February 7, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Deana C. Seymour, Judge | ) | |

---

### Affirmed and Certified as Final

---

The employee, a truck driver, reported suffering a right ankle injury when he tripped and fell while unloading a roll of carpet. After returning to work, the employee reported another incident resulting in a "pop" in his ankle and a significant increase in his symptoms while walking. Following a compensation hearing, the trial court determined the second reported incident was a direct and natural consequence of the compensable work injury, and it found the employee to be permanently and totally disabled. It also denied the employee's claim for additional temporary disability benefits and denied the employer's claim based on an alleged overpayment of such benefits. The employer has appealed, arguing the second incident was an independent, intervening event not causally related to the employee's compensable work accident. Upon careful consideration of the record, we affirm the trial court's order and certify it as final.

Presiding Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Judge David F. Hensley and Judge Pele I. Godkin joined.

Carolina Martin and Karl Braun, Nashville, Tennessee, for the employer-appellant, Mohawk Industries, Inc.

Monica Rejaei, Memphis, Tennessee, for the employee-appellee, Tawan Braden

### Factual and Procedural Background

Tawan Braden ("Employee"), a Mississippi resident, worked for Mohawk Industries, Inc. ("Employer"), located in Memphis, as a truck driver. On November 15, 2016, Employee reported a work-related injury to his right ankle when he tripped and fell

1

while unloading a strapped roll of carpet. Employer accepted the accident as compensable and initiated benefits. Employee was seen in an emergency room and referred to an orthopedic surgeon, Dr. David Richardson, who performed an open reduction and internal fixation to repair a lateral malleolus fracture in the right ankle. Thereafter, Employee was released to return to work in a sedentary capacity. Several months later, Employee underwent a procedure to remove a surgical screw and was again released to return to sedentary work. The following month, Employee was released to return to work without restrictions.

In July 2017, Employee returned to his treating physician with complaints of increased pain and other symptoms. He reported having suffered an incident at work where he felt a "pop" in his ankle and increased pain while walking. Later that month, Employee underwent a third surgical procedure recommended by Dr. Richardson to remove additional hardware inserted during the initial surgery. In October 2017, he was again released to return to work without restrictions.

Following Employee's report of continuing symptoms, Dr. Richardson ordered an MRI that revealed a peroneal tendon tear in the right ankle adjacent to the site of the malleolus fracture. Dr. Richardson recommended additional surgery, which was performed in April 2018. Thereafter, Dr. Richardson ordered additional therapy and assigned work restrictions. A functional capacity evaluation indicated Employee could return to work in the "light" physical demand category. In November 2018, Dr. Richardson recommended the use of a cane and referred Employee for chronic pain management with Dr. Ryan McGaughey. In September 2019, Dr. Richardson opined that Employee cannot stand for more than fifteen minutes at a time and cannot walk more than fifty yards at a time. He recommended lifting restrictions of no more than fifteen pounds repetitively, with no repetitive stair climbing or squatting. In May 2020, Dr. Richardson prescribed Employee a brace and ordered orthotics.

In preparation for trial, Employee was evaluated by David Strauser, Ph.D., a vocational expert. Dr. Strauser subsequently testified that Employee had sustained a "complete loss of earning capacity" as a result of his right lower extremity injuries. Dr. Strauser noted Employee reads at a kindergarten level, had limited transferable job skills, was undergoing continued pain management treatment, and required a cane for ambulation. He concluded Employee "would be unable to obtain or maintain work as is typically performed in the labor market."

At trial, Employer asserted that although Employee's original injury was a compensable event, the subsequent incident he reported as occurring in July 2017 was not a direct and natural consequence of the original injury but was instead an independent, intervening event unrelated to the 2016 work injury and not arising primarily out of the employment. Employee took the position that there was no subsequent injury-producing accident; instead, Employee asserted the increased symptoms he reported in July 2017 and

the tendon tear diagnosed several months later were a natural progression of his compensable right ankle condition.

Following trial, the court determined Employee had proven by a preponderance of the evidence that his right ankle condition, including the peroneal tendon tear that occurred in July 2017, was causally related to the compensable work accident. The court considered precedent from the Tennessee Supreme Court, specifically *Anderson v. Westfield Group*, 259 S.W.3d 690 (Tenn. 2008), and concluded the peroneal tendon tear was a direct and natural consequence of the work injury and not caused by any negligent act of Employee. Finally, the court determined that Employee's work-related injuries had rendered him permanently and totally disabled, but it denied the claims of both parties regarding an alleged underpayment or overpayment of temporary disability benefits. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2021). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings and credibility determinations made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed de novo. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2021).

**Analysis**

On appeal, Employer presents a number of issues that we have combined and restated as follows: (1) whether the trial court erred in determining that the July 2017 incident, the additional medical care, and Employee's permanent disability were direct and natural consequences of the original work injury; (2) whether the trial court erred in admitting into evidence the testimony of Employee's vocational expert because it was not based on sufficient facts/data, was not "in keeping with the medical records," and was admitted despite the expert's acknowledgement that he had destroyed his handwritten notes; (3) whether the trial court erred in declining to determine Employer had overpaid

temporary disability benefits; and (4) whether the trial court erred in determining Employee was "unable to return to any job in the open labor market."

*Direct and Natural Consequence Rule*

The employee in a workers' compensation claim has the burden of proving all essential elements of his or her claim for benefits. *Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). The critical issue in this case hinges on the parameters of an employee's burden of proof in circumstances where the employee alleges an injury that follows and allegedly flows from the primary compensable injury. The "direct and natural consequences rule" has evolved from such scenarios, and the Tennessee Supreme Court has evaluated the rule in a number of opinions. For example, in *Rogers v. Shaw*, 813 S.W.2d 397 (Tenn. 1991), an employee was diagnosed with lung cancer caused in part by his occupational exposure to asbestos. *Id.* at 398. In preparation for lung surgery, the employee was diagnosed with a coronary artery blockage that required treatment prior to the lung surgery. *Id.* During coronary bypass surgery, the employee suffered a stroke and died. *Id.* The employee's widow sought workers' compensation death benefits on the theory that that the employee's stroke was caused by treatment necessitated by his work-related lung condition. *Id.* In reversing the trial court's denial of death benefits, the Tennessee Supreme Court explained the general rule that "every natural consequence that flows from the [work-related condition] arises out of the employment, unless it is the result of an independent intervening cause attributable to the employee's intentional conduct." *Id.* at 399. The Court then cited with approval Professor Larson's explanation of the rule:

> The basic rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury. The simplest application of this principle is the rule that all the medical consequences and sequelae that flow from the primary injury are compensable.

*Id.* at 399-400. However, if the employee's own negligent conduct caused the subsequent injury or condition, the employer is not responsible. *See, e.g.*, *Bennett v. Magna Seating Sys.*, No. W2004-01177-WC-R3-CV, 2005 Tenn. LEXIS 380 (Tenn. Workers' Comp. Panel May 4, 2005) ("But if the subsequent injury is attributable to claimant's own negligence or fault, the chain of causation is broken, even if the primary injury may have contributed in part to the occurrence of the subsequent injury.").

In *Williams v. UPS*, 328 S.W.3d 497 (Tenn. Workers' Comp. Panel 2010), the Supreme Court's Special Workers' Compensation Appeals Panel affirmed a trial court's award of benefits for a subsequent injury. In that case, the employee had suffered a compensable left knee injury then subsequently developed a worsening of his pre-existing right knee condition that he attributed to "over-reliance on his right leg." *Id.* at 498. The

employee presented testimony of an orthopedic surgeon who concluded the employee's "right knee deterioration was advanced and progressed by the . . . work injury to his left knee." *Id.* at 500. The treating physician had not commented on or treated the right knee condition and did not assign any permanent medical impairment to that condition. *Id.* After reviewing the trial court's weighing of the medical evidence, the Appeals Panel concluded, "the trial court could have reasonably ruled in favor of either party on this issue" and "we are unable to conclude the evidence preponderates against the trial court's ruling." *Id.* at 504-05.

In *United Parcel Service, Inc. v. Brown*, No. M2014-01332-SC-R3-WC, 2015 Tenn. LEXIS 628 (Tenn. Workers' Comp. Panel Aug. 11, 2015), an employee suffered a compensable injury to her right knee. *Id.* at *1. During her period of recovery, about one month after surgery, she bent over in her backyard to pick up an object and lost her balance. *Id.* at *3. She grabbed a fence to prevent her from falling, but she "felt an immediate twinge in the knee." *Id.* Her physician diagnosed a "possible failure" of the ACL repair and recommended additional surgery. *Id.* at *4. At trial, the employer argued that the subsequent event in the employee's backyard was an independent, intervening accident that broke the chain of causation. *Id.* at *5. The trial court disagreed and concluded the second injury was a direct and natural consequence of the original injury. *Id.* In rejecting the employer's arguments on appeal, the Appeals Panel noted that the physician opined her post-surgery activities, including the incident in her backyard, were not "inappropriate" and were not "out of the ordinary." *Id.* at *10-11. The Panel affirmed the trial court's finding that the subsequent injury was a direct and natural consequence of the primary compensable injury, and the employee's actions did not constitute negligence and did not break the chain of causation. *Id.* at *11.

In discussing the scope of the direct and natural consequence rule, the Supreme Court in *Anderson v. Westfield Group* explained that the limit of the rule "hinges on whether the subsequent injury is the result of independent intervening causes, such as the employee's own conduct." *Anderson*, 259 S.W.3d at 697. The Court further explained:

> The rule's limitation has been expressed in general terms as "[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, *unless it is the result of an independent intervening cause attributable to the claimant's own intentional conduct.*" "More specifically, the progressive worsening or complication of a work-connected injury remains compensable *so long as the worsening is not shown to have been produced by an intervening nonindustrial cause.*"

*Id.* (quoting 1 <u>Larson's Workers' Compensation Law</u> §10 (2004)) (emphases added). The Court then rejected the employee's argument that an employee's conduct must rise to the level of reckless or intentional to be considered an independent, intervening cause. *Id.* at

698-99. Instead, the Court concluded, "negligence is the appropriate standard for determining whether an independent intervening cause relieves an employer of liability for a subsequent injury purportedly flowing from a prior work-related injury." *Id.* at 699.

Finally, in *Kirby v. Memphis Jewish Nursing Home*, No. W2010-02261-WC-R3-WC, 2011 Tenn. LEXIS 1135 (Tenn. Workers' Comp. Panel Dec. 1, 2011), an employee suffered a work-related shoulder injury that necessitated surgical repair of labral and biceps tendon tears. *Id.* at *2. Several month later, as the employee was outside with his unleashed dog, he grabbed the dog by the collar, and it attempted to run away, jerking his arm. *Id.* at *3. The employee returned to his physician with complaints of increased symptoms, and the physician determined the prior shoulder surgery had failed, necessitating an additional surgery. *Id.* Thereafter, a functional capacity evaluation revealed Employee could not meet the lifting requirements of his previous job. *Id.* at *4. At trial, the court concluded that Employee had not acted negligently while grabbing his dog by the collar and that the risk of the initial surgery failing was a "natural consequence" of the original work injury. *Id.* at *7. In affirming that determination, the Supreme Court's Special Workers' Compensation Appeals Panel noted that failure of the original surgery was "simply one of the risks of the procedure." *Id.* at *10. It then concluded, "the evidence does not preponderate against the trial court's conclusion that Employee did not act negligently and that the [subsequent injury] was a direct and natural consequence of the earlier work injury." *Id.*

*Impact of 2013 Workers' Compensation Reform Act*

A corollary issue that arises in the context of this case is whether the general assembly's passage of the 2013 Workers' Compensation Reform Act abrogated the direct and natural consequences rule or limited its scope. In *Hudgins v. Global Personnel Solutions, Inc.*, No. 2017-01-0690, 2020 TN Wrk. Comp. App. Bd. LEXIS 19 (Tenn. Workers' Comp. App. Bd. Apr. 17, 2020), we addressed the applicability of the direct and natural consequence rule in the context of a post-2013 Workers' Compensation Reform Act case. In that case, the employee alleged that her altered gait caused by a work-related knee injury resulted in hip and lumbar spine injuries. *Id.* at *4. In affirming the trial court's interlocutory order for medical benefits for the employee's hip and lumbar spine conditions, we explained:

> "[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment." Therefore, "all the medical consequences and sequelae that flow from the primary injury are compensable."

*Id.* at *5-6 (quoting *Rogers*, 813 S.W.2d at 400). We then concluded the employee was not required to prove her hip and lumbar spine conditions arose primarily from a specific

6

incident or set of incidents at work as long as the record established that those conditions were the direct and natural consequence of a compensable work injury. *Id.* at *6.

In the present case, the compensability of the original work accident is not in dispute, but the medical evidence supports a finding that the peroneal tendon tear did not occur at the time of the original work accident. When asked during his deposition whether "the injury that he sustained at work in November of 2016 [was] the primary cause of this injury and his complications," Dr. Richardson replied, in part, "it would be difficult from what I know to attribute his injury and his continued pain on his right ankle to anything but what happened at work." When asked if the "issues that [Employee is] suffering from related to the right ankle are primarily related to the work injury," he responded "[t]hat would be my opinion."

During cross-examination, Dr. Richardson acknowledged that he originally released Employee to return to work without restrictions in April 2017. He further admitted that Employee's malleolus fracture and deltoid ligament injury had healed by April 2017. In fact, he was asked whether the April 2017 injury had "healed . . . with no impairment, no restriction," and he replied that was "correct."

However, Dr. Richardson also explained that "the peroneal tendons go – they are intimately . . . right next to the lateral malleolus fracture so they go . . . beside it. And . . . they rub . . . . The way those tendons move up and down is back and forth on the lateral malleolus . . . which had a fracture." He then explained that "peroneal tendonitis following a lateral malleolus fracture is fairly common." He testified that Employee "certainly ha[d] an increased risk of having that peroneal tendonitis with his previous injury." With respect to the subsequent peroneal tendon tear, Dr. Richardson explained, "I think he would have an increased risk of it happening, because he had previous surgery, because he had had hardware . . . that's right by the tendon. He had scar tissue. It's . . . if you're going to do surgery – so that is also going to increase his risk of . . . getting a peroneal tendon tear."

With respect to the second incident in July 2017, Employee testified he "was walking to the bathroom, and [he] felt a sharp pain going through [his] leg and – and it kept on hurting and hurting." The following colloquy then occurred:

Q. Did you, like, slip and fall?
A. No.
Q. All right. You go up a stair, down a stair?
A. No.
Q. Okay. Were you carrying anything and, like, twisted it?
A. No.
Q. Okay. So just walking.
A. Just walking.

7

In sum, an employee seeking to prove that a subsequent injury was a direct and natural consequence of the original compensable injury must come forward with evidence supporting a finding that the subsequent injury "flowed from" or was a "natural consequence" of the original injury. In such circumstances, one way an employer can respond is by showing that the actions of the employee leading to the subsequent injury constituted negligence, recklessness, or intentional conduct that broke the chain of causation. Further, we conclude that nothing in the 2013 Workers' Compensation Reform Act expressly abrogated or limited the scope of the direct and natural consequences rule. If this common law rule is to be re-interpreted in light of the Reform Act to require a higher degree of proof from the employee to show a causal link between the original injury and the subsequent injury, it is for our Supreme Court, not us, to address.

Here, although Dr. Richardson's testimony was confusing and muddled at times, we conclude he offered sufficient evidence that the peroneal tendon tear flowed from and was a natural consequence of the original malleolus fracture and the surgery to repair that fracture. Dr. Richardson testified without contradiction that Employee's original work injury increased his risk of and made him more susceptible to experiencing a peroneal tendon tear. He further explained that the rubbing of the peroneal tendon across the site of the malleolus fracture likely weakened that tendon. Moreover, the record is devoid of any evidence that Employee's actions on the date of the second incident in July 2017 were negligent, reckless, or intentional. Thus, we conclude there is no evidence that Employee's actions in July 2017 constituted an independent, intervening event sufficient to break the chain of causation. In consideration of the record as a whole, we cannot conclude the trial court erred in determining the peroneal tendon tear, additional medical treatment resulting from the tear, and resulting permanent vocational disability were direct and natural consequences of the original work injury.

*Temporary Disability Benefits*

Employer next asserts the trial court erred in failing to give it a credit for temporary total disability payments it made after Employee was originally placed at maximum medical improvement on April 19, 2017. Although the trial court identified the "date of maximum medical improvement" as an issue for trial, neither party presented any testimony regarding that issue during the course of the trial. Employee did, however, introduce into evidence the deposition of Dr. Richardson without objection. Dr. Richardson testified that he originally placed Employee at maximum medical improvement on April 19, 2017, but that Employee returned to him in July 2017 with complaints that led to the peroneal tendon tear diagnosis. This, in turn, led to additional surgery, and Dr. Richardson testified he placed Employee at maximum medical improvement again on November 8, 2018.

Employer asserted during closing arguments that ten weeks of temporary disability benefits Employer paid between April 23, 2018 and July 4, 2018, which it calculated to

equal $7,359.96, should have been deemed an overpayment and backed out of his permanent disability award. However, the issue of the alleged overpayment of temporary disability benefits hinges on our resolution of the issue concerning the direct and natural consequence rule. If the July 2017 peroneal tendon tear was a direct and natural consequence of the original work injury, and Dr. Richardson did not place Employee at maximum medical improvement for the peroneal tendon tear until November 8, 2018, then the temporary disability payments made between April and July 2018 would not be considered an overpayment of temporary disability benefits because they would not have been paid after Employee reached maximum medical improvement. Thus, given our conclusion that the trial court did not err in its determination that the peroneal tendon tear was a direct and natural consequence of the original work injury, it was not error for the trial court to decline to find an overpayment of temporary disability benefits.[1]

*Admissibility of Vocational Expert's Testimony*

Next, Employer asserts that Dr. Strauser's testimony should have been excluded because his opinions were not "based on sufficient data," were not "in keeping with the medical records," and he admitted to having destroyed his handwritten notes prior to his testimony. Employer bases its legal arguments on Rule 705 of the Tennessee Rules of Evidence and Rules 34A.02 and 37 of the Tennessee Rule of Civil Procedure.

With respect to Employer's argument that Dr. Strauser's opinions were not "based on sufficient facts/data" and were "not in keeping with the medical records," we recently addressed similar issues in *Lawson v. Amazon.com Services, LLC*, No. 2021-01-0213, 2021 TN Wrk. Comp. App. Bd. LEXIS 47 (Tenn. Workers' Comp. App. Bd. Dec. 27, 2021). In that case, the employer argued that medical records and an affidavit of the employee's physician were "fundamentally untrustworthy" because the employee had failed to inform various medical providers of the extent and nature of his pre-existing condition. *Id.* at *5. In rejecting the employer's argument that the trial court erred in not excluding the physician's records and affidavit, we explained as follows:

> It is well settled that the admissibility of evidence is within the discretion of the trial judge. A trial court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Id.* at *5-6 (citations omitted). We then concluded that any discrepancies in the medical histories provided by the employee to his medical providers impacted the weight but not the admissibility of the expert's testimony. *Id.* at *7. We reach similar conclusions here. It was within the trial court's discretion to admit into evidence Dr. Strauser's testimony. It

---

[1] Employee did not raise as an issue on appeal whether he was owed additional temporary disability benefits.

was the trial court's role to weigh that testimony against any countervailing evidence. Here, Employer chose to offer no testimony from a vocational expert but relied on its cross-examination of Employee's vocational expert. We conclude Employer has not shown that the trial court abused its discretion in admitting Dr. Strauser's testimony into evidence or erred in its assessment of the expert proof.

Rule 705 of the Tennessee Rules of Evidence provides that an expert "may . . . be required to disclose the underlying facts or data on cross-examination."[2] In circumstances where "a party or an agent of a party . . . discards, destroys, mutilates, alters, or conceals evidence," the court can impose Rule 37 sanctions. Tenn. R. Civ. P. 34A.02. In *Foley v. St. Thomas Hosp.*, 906 S.W.2d 448, 454 (Tenn. App. 1995), the Tennessee Court of Appeals addressed a motion for exclusion of an expert's testimony based on the alleged spoliation of evidence. In that case, a medical examiner performing an autopsy followed what he described as standard medical practice to destroy bodily organs after they are removed and sampled during an autopsy. *Id.* at 451. The defendant argued that the medical examiner had made it impossible to examine facts or data underlying his expert opinions due to the destruction of the bodily organs, and the trial court agreed. *Id.* at 452.

On appeal, the Court of Appeals reversed this determination, concluding there was no spoliation of evidence:

> This record is devoid of any facts or evidence that [the physician's] incineration of the deceased's organs was done negligently or intentionally to suppress the truth. There is no evidence that other experts in pathology would be prejudiced by not having the organs themselves . . . . Nowhere did defendants establish by competent medical proof that another pathologist could not reasonably review [the medical examiner's] work . . . . Defendants have failed to establish any intent to spoliate or destroy evidence.

*Id.* at 454. We reach similar conclusions here. At trial, Dr. Strauser acknowledged that he took handwritten notes during his interview of Employee and that he discarded those notes after preparing his written report. He explained that "the relevant portions of those notes are included in my report and in the documentation that I have." Employer asked the court to reach an inference that the destroyed notes "could have been positive for the employer." In response, Employee argued it was standard practice for a vocational expert to take notes during an interview but not retain those handwritten notes after the expert's written report was prepared. The trial court declined to infer anything from the destroyed notes but allowed Employer to cross-examine Dr. Strauser regarding his evaluation of Employee and the contents of his written report.

---

[2] In full, Rule 705 states: "The expert may testify in terms of opinion or inference and give reasons *without prior disclosure of the underlying facts or data*, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Tenn. R. Evid. 705 (emphasis added).

On appeal, Employer now asks that Dr. Strauser's entire testimony "be stricken." Yet, at trial, Employer asked the court to infer the presence of evidence favorable to Employer's position in the destroyed handwritten notes. Employer has come forward with no evidence that Dr. Strauser intentionally destroyed his notes in contravention of standard practice for vocational experts. There is no evidence that Dr. Strauser destroyed his notes intentionally in an effort to hide evidence or that another vocational expert would have been precluded from or hindered in reviewing Dr. Strauser's report and opinions due to the destroyed notes. In short, Employer has not established sufficient evidence of an intentional spoliation of evidence to support any relief on appeal.

*Permanent Total Disability*

When an employee's disability arising primarily out of a work-related injury is adjudged to be permanent, the employee is entitled to permanent disability benefits based on the degree of vocational disability caused by the injury. *Brown v. State*, No. 01S01-9502-BC-00020, 1995 Tenn. LEXIS 712, at *4-5 (Tenn. Workers' Comp. Panel Nov. 22, 1995). Such benefits begin to accrue as of the date the employee reaches maximum medical improvement. *Smith v. United States Pipe & Foundry Co.*, 14 S.W.3d 739, 740 (Tenn. 2000). Moreover, an employee may be found permanently and totally disabled "[w]hen an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income." Tenn. Code Ann. § 50-6-207(4)(B) (2021). In assessing an employee's permanent vocational disability caused by a work injury, the court can consider a number of factors, including the employee's medical impairment, job skills, education, age, training, "job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability." *Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 535-36 (Tenn. 2006). An employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, "is competent testimony that should be considered." *Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770, 774 (Tenn. 2000). The extent of an employee's vocational disability is a question of fact to be determined from both lay testimony and medical evidence. *Id.* at 773.

Here, Dr. Richardson testified Employee would be unable to stand for more than 15 minutes at a time, would be unable to walk for more than fifty yards without stopping, and would be unable to lift fifteen pounds or more repetitively. Employee testified he continues to seek pain management treatment and regularly uses a cane for ambulation. Dr. Strauser testified that Employee reads at a kindergarten level. He concluded Employee would be "unable to maintain work as [it] is typically performed in the labor market." He also opined Employee had a "100% vocational loss." Employer offered no vocational expert testimony to rebut Dr. Strauser's opinions. Based on the record as a whole, we cannot conclude the trial court erred in its assessment that Employee is permanently and totally disabled.

**Conclusion**

For the foregoing reasons, we affirm the trial court's order and certify it as final. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Tawan Braden | ) | Docket No. 2019-08-0544 |
| | ) | |
| v. | ) | State File No. 89807-2016 |
| | ) | |
| Mohawk Industries, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard February 7, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Deana C. Seymour, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 1st day of March, 2022.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Carolina Martin | | | | X | carolinamartin@hallboothsmith.com kbraun@hallboothsmith.com |
| Monica Rejaei | | | | X | mrejaei@nstlaw.com jkarpovich@nstlaw.com |
| Deana C. Seymour, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |



Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov